NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

RAPID BINDERY, INC., and Frontier
Bindery Corporation, Respondents.

No. 158, Docket 26431.

United States Court of Appeals
Second Circuit.

Argued Feb. 6, 1961.

Decided July 11, 1961.

Claims,* and WATERMAN, Circuit Judge.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, Jules H. Gordon, Attys., N. L. R. B., Washington, D. C., for petitioner.

Raichle, Moore, Banning & Weiss, Buffalo, N. Y. (Frank G. Raichle, Arnold Weiss, Buffalo, N. Y., of counsel), for respondents.

Before LUMBARD, Chief Judge, MADDEN, Judge, U. S. Court of Claims,* and WATERMAN, Circuit Judge.

WATERMAN, Circuit Judge.

The National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act (N.L.R.A.), 29 U.S. C.A. § 160(e), has petitioned this court for enforcement of its order of April 15, 1960 issued against the respondents Rapid Bindery, Inc. (Rapid) and Frontier Bindery Corporation (Frontier).

Until March 1959 Rapid operated a bindery plant in Dunkirk, N. Y. The source of its work was Greater Buffalo Press, Inc. (Buffalo), a commercial printer. Buffalo's printing plant was located in Buffalo, N. Y. Buffalo did some of its own bindery work and subcontracted the remainder of it to Rapid. For reasons to be developed later in this opinion, Rapid became unable adequately to service Buffalo. Thereupon, the sole shareholders of Rapid, J. Walter Koessler and his brother, Kenneth Koessler, together with William Hammond, an officer of Rapid acting as trustee for members of the Koessler family, formed a new entity, Frontier. Frontier's plant was in Tonawanda, N. Y. It began as a partnership but was later incorporated, all the stock being owned by the two Koesslers and by Hammond as trustee. This led the trial examiner, whose findings and conclusions were accepted *in toto* by the Board, to find as a fact that Frontier was the alter ego of Rapid. That finding is clearly correct. Moreover, Buffalo and the Great Lakes Color Printing Corp. (hereinafter Great Lakes) from which Rapid rented space at Dunkirk were also owned and controlled by these same individuals. Therefore there emerges from the Board's record a picture of an integrated printing operation controlled by the Koesslers. Based upon these facts the trial examiner treated the case as one where there had been a transfer by a single entity of work from one plant to another, followed by the subsequent abandonment of the old plant. He found that

* Sitting by designation.

this transfer of work from, and subsequent abandonment of, the Rapid plant were effected in order to discourage membership in a newly formed local union, Labor Union No. 685, Printing Specialties and Paper Products Union, International Printing Pressmen and Assistants' Union of North America, AFL-CIO (Union) the charging union, and were acts in violation of § 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 158 (a) (3). He further found that by failing to give notice to No. 685 of the plans to move and by not opening the subject of the proposed move during pending collective bargaining negotiations the respondents had failed to bargain collectively in good faith and hence had violated § 8(a) (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (5). And, finally, he also found that because of these violations that he had so found, and because of certain additional incidents of interference with and restraint and coercion of the employees in the exercise of rights guaranteed by § 7 of the Act, 29 U.S.C.A. § 157, the respondents had violated § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1). The Board's order adopted the Examiner's recommendations and directed the respondents to cease and desist from discouraging membership in Union and from interfering with the exercise by their employees of rights guaranteed to them by the Act. Affirmatively, respondents were ordered to offer employment to those employees who were displaced by the move from Dunkirk to Tonawanda, to pay the expenses of moving from Dunkirk to Tonawanda of those employees willing to go there and of their families, and to reimburse the employees for wages lost by the transfer of work from Rapid at Dunkirk to Frontier at Tonawanda, and the wages lost by the subsequent total abandonment of the Rapid Dunkirk plant.

Respondents admit that they were something less than happy to have Union appear on the scene at a time when economic considerations were making some sort of a change in their business operations mandatory. In respondents' view Union's arrival made the change even more pressing. The trial examiner stated that:

"Without attempting to appraise the merit of the economic reasons advanced, since it is of no concern of the Trial Examiner or of the Board whether the Koesslers used good or bad business judgment, the Trial Examiner assumes that because of increased business, and the lack of adequate operating space at the Dunkirk premises, some readjustment was necessary."

During the course of the hearing the examiner appeared to concede the economic necessity of the removal from Dunkirk by discouraging evidence tending to prove it. However, from the evidence that was admitted it is clear that the transfer of operations from Dunkirk was indeed economically necessary. Despite this, the examiner found that the move was not made solely for economic reasons but was made "in an atmosphere redolent with hostility toward the Union, and for the purpose of discouraging membership in it," and consequently that the respondents violated § 8(a) (3).

We are of the opinion that this last finding is an erroneous one in that it is not supported by substantial evidence and is not in accord with the law as the law has developed under § 8(a) (3). We are also of the opinion that, inasmuch as the move was made through a legitimate exercise of managerial discretion the issue of whether it was to be made need not have been submitted by respondents for discussion at the collective bargaining table under § 8(d) of the National Labor Relations Act, 29 U.S.C.A. § 158 (d). However, we agree with the Board that the failure to give notice to the union of the move and failure to discuss the treatment to be accorded displaced employees was a violation of § 8(a) (5). We also find that the record contains substantial evidence to support the Board's determination that the respondents committed an unfair labor practice within the purview of § 8(a) (1). We will grant enforcement to as much of the Board's or-

der as deals with the § 8(a) (1) and § 8 (a) (5) violations.

### I. The § 8(a) (3) violations.

Rapid proved that the Dunkirk operation had been an unsuccessful one almost from its inception. For some time prior to the final decision to abandon operations there the Koesslers had been actively seeking a new plant. Rapid was located in little more than a railroad shed appended to the Great Lakes plant. The floor plan was long and narrow and unsuitable for bindery operations. Prior to the fall of 1958 the space had become inadequate. A competent work force was difficult to maintain in Dunkirk. The evidence was that within the span of one year the corporation had been forced to hire 232 individuals in order to maintain a work force of 40. Many overtime hours were required, hours that would not have been necessary if a full complement of employees could have been constantly maintained. Although Rapid did some work for Great Lakes, the bulk of the work it did was for Buffalo, and Rapid's costs were enhanced because of the transportation expense between the two cities of Buffalo and Dunkirk.

Then in the fall of 1958 at about the time Union appeared on the scene Buffalo obtained a large commercial printing job for the preparation of catalogs from its customer, Western Auto Stores. This job was substantially larger than anything Buffalo had previously undertaken and the bindery work required for it was also sizable. It was obvious to respondents that Rapid could not do the job. Rapid lacked both space and a sufficient work force, and the transportation costs would have been exorbitant. Moreover, it was stated that the post office in Dunkirk could not handle the heavy mailings involved in Western Auto's plan for its catalog distribution. However, the examiner found that the decision to move from Dunkirk was not finally decided upon until after Union came on the scene. The record supports this finding. Union's petition for recognition as bargaining agent was filed with the Board on October 6, 1958. A consent election was agreed to on October 13. The election was conducted by the Board on October 30. On November 6 Union was certified. The examiner accepted Kenneth Koessler's testimony that management's decision to move was not finally made until early November.

Subsequent to the October 6 petition for recognition and prior to the October 30 election, certain of Rapid's supervisory personnel talked about a possible closing of the Dunkirk operations with employees who were active in fostering a union. Respondents conceded that there had been discussions with the employees during which statements had been made to them. The content of the statements was disputed. Respondents claim that any reference made to moving was only to apprise the employees of the situation and was not intended to threaten them. The employees testified that the move was represented as a threatened punishment for union activity. The examiner accepted the employees' version, and we accept that determination.

Pursuant to the decision respondents had finally made in early November part of Rapid's plant was moved to Frontier's facilities at Tonawanda on or about December 3, 1958. This was about a month after the certification of Union. At Tonawanda there were none of the disadvantages suffered at Dunkirk. Frontier had sufficient floor space so that work could be performed there efficiently. It was located in a suburb of the City of Buffalo and transportation costs were thereby substantially reduced. There was no post office problem and a large labor force was available. In Dunkirk where negotiations by the newly certified union for a collective bargaining agreement were in progress the immediate effect on the employees of Rapid was to reduce the work week. All that Rapid continued to do there was a single bindery job for Buffalo. No mention of the move was made to the union representative during these negotiations, though the examiner found that subsequent to the move certain of the supervisory personnel again intimated to some employees

that the move was a punishment for union activity. Thereafter, on December 23, 1958, a collective bargaining agreement, to be effective until January 1960, was signed by Rapid and Union.

Rapid's plant was finally fully closed on March 1, 1959 when Buffalo withdrew from Rapid all of its remaining bindery work. Buffalo was forced to do this because Buffalo's Canadian customer for whom the work was being done had a clause in its union contract that required such work to be done by the Mailer's Union, a different International Union than the one certified at Rapid.

Upon the facts so found the Board is of the opinion that the respondents violated § 8(a) (3) at two junctures. The first was in December when a part of the machinery was moved from Rapid at Dunkirk to Frontier at Tonawanda. The second was when Rapid's Dunkirk operation was totally abandoned. Rapid sought to justify these moves on the ground of sound economic need. In our view the record supports the employer's contentions. The Board's position appears to be that a move by management when that move is required for sound business reasons is nevertheless an unfair labor practice if the move is accelerated or reinforced by contemporaneous employer differences with a union. This position is not supported by the language of the Act or by the decisional law interpreting that language. The subsection reads:

"§ 8(a) It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:
\* \* \* "

This language has been interpreted to mean that a change or discontinuance of the employer's business operations in order to avoid obligations imposed upon it by the National Labor Relations Act is a violation of the subsection. N. L. R. B. v. Brown-Dunkin Co., 10 Cir., 1961, 287 F.2d 17; N. L. R. B. v. E. C. Brown Co., 2 Cir., 1950, 184 F.2d 829. For example, in N. L. R. B. v. E. C. Brown Co., supra, we enforced an order directing an employer to rehire employees displaced by the formation of a second corporation. However, there the second corporation was an exact replica of the superseded entity.

In those situations where a change or discontinuance of business operations is dictated by sound financial or economic reasons the courts have refused to find that § 8(a) (3) has been violated even though the employer action may have been accelerated by union activity. N. L. R. B. v. Lassing, 6 Cir., 1960, 284 F.2d 781, certiorari denied 1961, 366 U.S. 909, 81 S.Ct. 1085, 6 L.Ed.2d 235; N. L. R. B. v. R. C. Mahon Co., 6 Cir., 1959, 269 F.2d 44; N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848. In Lassing an employer had been toying with the idea of terminating its own transportation of the gas it produced in favor of utilizing a common carrier for this purpose, and had determined that any further increase in costs would dictate such a move. A union demand for recognition of three of its drivers foreshadowed just such an increase. The discontinuance of private carriage in favor of common was not found to be violative of § 8(a) (3). N. L. R. B. v. R. C. Mahon Co., supra, was a similar situation. There plant guards were discharged for reasons of economy and the employer hired an independent contractor to supply it with plant protection.[1]

The case of N. L. R. B. v. Houston Chronicle Pub. Co., supra, where the background situation was as redolent with animosity as it was in the instant

1. In N. L. R. B. v. Brown-Dunkin Co., supra, where the court held that the employer had violated the Act, it was held that the Board had justifiably concluded that doing the work through the use of an independent contractor was more costly to the employer than it would have been if the employer had done it with its own personnel.

case, is closest on its facts to our case. There the Board found violations of §§ 8(a)(3), 8(a)(5) and 8(a)(1) when the employer changed its system of newspaper delivery from one which it controlled to one operated by independent contractors. As here, the corporation produced testimony to show that the change was required by economic necessity; but in the case before us that testimony was not challenged. There it was. Nevertheless, on review the Court of Appeals held that the Board's finding that the employer's act had been illegally motivated was not supported by substantial evidence, and that the real motivation was the one of economic necessity.

■ It is our view that the record before us does not support the inference drawn from it by the Board that Rapid's move was motivated by the desire to avoid its obligations to Union. All of the evidence points to motivation for sound business reasons. Though there may have been animosity between Union and Rapid, animosity furnishes no basis for the inference that this was the preponderant motive for the move when convincing evidence was received demonstrating business necessity. The decided cases do not condemn an employer who considers his relationship with his plant's union as only one part of the broad economic picture he must survey when he is faced with detemining the desirability of making changes in his operations.

■ A word is perhaps necessary with respect to the questions presented by the final abandonment of Rapid's Dunkirk operations. Though the December movement of machinery to Frontier appears clearly justifiable for valid economic reasons, the Board claims that the final abandonment at Dunkirk resulted from the pressure brought to bear on Rapid by the Canadian customer and that submission to this pressure was illegal and violated the Act. The Board argues that this caused Rapid to discriminate against Union in favor of the Mailer's Union. It relies on N. L. R. B. v. Hudson Motor Car Co., 6 Cir., 1942, 128 F.2d 528, for the proposition that employer discrimination between unions for sound economic reasons is illegal. However, Hudson is not in point. In that case there were two unions in the employer's plant. Each represented certain employees. Because of threats and pressure brought upon Hudson by a favored union, it was discriminating against the other. This is an entirely different situation from the one before us. Rapid's continued life depended on business which it could no longer do unless it acceded to a legitimate demand made by a customer who conditioned its contract upon Rapid's compliance. Inability to comply with the demand of the Canadian customer put Rapid out of business. This situation was not within the control of Rapid whose employees were not members of the Mailer's Union, or of Buffalo, some of whose employees were.

II. The § 8(a)(5) violation.

Section 8(a) provides:

"It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

"(5) to refuse to bargain collectively with his employees \* \* \*"

Section 8(d) defines "to bargain collectively." It reads as follows:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: \* \* \*"

We have detailed the chronology of events applicable to a discussion of this violation in our treatment of the claimed § 8(a)(3) violation. Union had been

certified prior to the movement of machinery to Frontier. Rapid and Union had two bargaining meetings prior to the move. A collective bargaining agreement was discussed and proposals were submitted for consideration by both sides. At no time was Union formally apprised of the prospective move.

In N. L. R. B. v. Katz, 2 Cir., 1961, 289 F.2d 700, we recently considered in some detail the purport of the requirement that the employer bargain collectively. We there held that this statutory duty insures, first, that the employer shall commence a bargaining with respect to rates of pay and hours and conditions of employment, and, second, that once the bargaining has commenced the employer shall make a good faith effort to reach agreement. But there is no statutory requirement that agreement be reached. In the present case the second stage of the employer's duty was not involved, for the move was never submitted as a subject for bargaining. Only the first stage is involved. Was the failure to submit the move as a subject for bargaining a refusal to bargain with respect to rates of pay, hours and conditions of employment? The decision to move was not a required subject of collective bargaining, as it was clearly within the realm of managerial discretion. However, once that decision was made, § 8(a) (5) requires that notice of it be given to the union so that the negotiators could then consider the treatment due to those employees whose conditions of employment would be radically changed by the move. Nothing affects conditions of employment more than a curtailing of work, and such a curtailment is properly the subject of collective bargaining.

■■ Respondents argue that Union had notice of the proposed move through statements made to the employees, and through rumors current among them. The examiner found the contrary to be the fact, and his determination is supported by substantial evidence from the record taken as a whole. Moreover, we are of the opinion that conjecture or rumor is not an adequate substitute for an employer's formal notice to a union of a vital change in working conditions that had been decided upon.

■ The Trial Examiner found that:

"The Respondents closed their Dunkirk operation and effectively discharged all employees without consulting with the Union or giving it an opportunity to bargain with respect to the contemplated change as it affected employment."

We understand it to be the duty of the employer to do precisely what the examiner found was not done here; and hence the Board's conclusion that respondent violated § 8(a) (5) is affirmed.

III. The § 8(a) (1) violations.

Section 8(a) provides:

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7[2] * * *"

■■ Little discussion is necessary with respect to the Board's conclusions that the employer committed § 8(a) (1) violations. The record is replete with incidents of employer restraint and coercion if one is to accept the testimony of the employees. The examiner did accept this testimony, and it is his proper function to assess the credibility of the witnesses. N. L. R. B. v. Jackson Maintenance Corp., 2 Cir., 1960, 283 F.2d 569. Respondents argue that the statements

2. "§ 7. Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3) of this Act."

made and testified to were merely expressions of opinion by minor supervisory personnel and were not, as the Board held, chargeable to respondents. However, we agree with the Board's conclusions. Officers and supervisors made clear their antipathy to the union and attempted to dissuade employees from voting for it. This activity is violative of § 8(a) (1).

### IV. The Remedy.

The remedies chosen by the Board are too broad for the violations that were properly found.

■ Those portions of the order that direct the respondents to cease and desist from interfering with the employees' exercise of their guaranteed rights are clearly proper in view of the finding of § 8(a) (1) violations.

The portion of the order that requires an offer of employment to the displaced employees is proper in view of our holding that there had been a § 8(a) (5) violation.

■ However, the portion of the order that requires respondent Frontier to recognize Union as the exclusive bargaining representative at the Frontier plant in Tonawanda is not proper inasmuch as Union does not appear to represent any of the employees in the Tonawanda plant. If it later should happen that a substantial number of Rapid's employees accept employment in Tonawanda or that a substantial number of Frontier's employees designate Union as their representative, Union could properly petition the Board for another election at that plant.

■ Moreover, the portions of the order should not be enforced that require respondents to make the employees whole by paying them allegedly lost wages and certain contingent traveling expenses.[3] These order provisions are based upon the § 8(a) (3) violations that the Board found and which we have struck down. We hold that the move was motivated by sound economic reasons and it is our view that any obligation due to Rapid's employees will be fulfilled by offering them jobs at the Frontier plant in Tonawanda.

The order, as modified by us, appears in the Appendix to this opinion, and we decree that as so modified it be enforced.

### Appendix

The Board's order is modified to delete the italicized portions.

---

3. The Board's order in this particular adopted by reference the Examiner's detailed recommendations, and, although we are striking out this portion of the order, we insert for clarity the Examiner's applicable language:

"It will be recommended that the Respondents offer all employees discharged at their Dunkirk, New York, plant on or about March 1, 1959, immediate and full reinstatement to their former or substantially (sic) [equivalent] positions at their Dunkirk plant, if they reopen it, or at their Tonawanda, New York, plant, without prejudice to their seniority or other rights and privileges, dismissing, if necessary to provide employment for those offered and accepting employment, all employees at the Tonawanda plant. It will also be recommended that the Respondents pay the employees the expenses entailed in moving their families and household effects, in the event the Respondents do not reopen Dunkirk plant. It will further be recommended that the Respondents make whole these employees for any loss of pay they may have suffered by reason of the Respondents' discrimination against them in the following manner: (a) to all employees on the payroll as of December 3, 1958, a sum of money equal to that which they suffered as loss thereafter by reason of the discriminatory move of machinery, and (b) to all employees listed in Appendix A. attached hereto, a sum of money equal to the amount each would normally have earned as wages from March 1, 1959, to the date of offer of reinstatement less his or her net earnings during such period, and in conformance with Board policy as set out in F. W. Woolworth Company, 90 NLRB 289, and Crossett Lumber Company, 8 NLRB 440. It will also be recommended that the Respondents, upon request, make available to the Board and its agents all payroll and other records pertinent to the analysis of the amounts of backpay due and the right of reinstatement."

ORDER

Upon the entire record in this case, and pursuant to Section 10(c) of the National Labor Relations Act, as amended, the National Labor Relations Board hereby orders that Respondents, Rapid Bindery, Inc., Dunkirk, New York, and Frontier Bindery Corporation, Tonawanda, New York, their officers, agents, successors, and assigns, shall:

1. Cease and desist from:

(a) Discouraging membership in Local Union No. 685, Printing Specialties and Paper Products Union, International Printing Pressmen and Assistants' Union of North America, AFL-CIO, or in any other labor organization of their employees, by discharging, laying off, refusing to reinstate, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of employment;

(b) Threatening employees with economic reprisals or making them promises of benefit to discourage membership in or activity on behalf of any labor organization;

(c) In any other manner interfering with, restraining, or coercing employees in the exercise of the right of self-organization, to form labor organizations, to join or assist the above-named or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in any other concerted activities for the purpose of collective bargaining or other mutual aid or protection or to refrain from any or all such activities, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(a)(3) of the Act, as modified by the Labor-Management Reporting and Disclosure Act of 1959.

2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act:

(a) Offer the employees listed in Appendix A,* attached to the Intermediate Report, immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights and privileges, *and make them and all employees on the December 3, 1958, payroll whole in the manner set forth in the section of the Intermediate Report entitled "The Remedy";*

(b) *Preserve and, upon request, make available to the National Labor Relations Board, or its agents, for examination and copying, all records necessary for the determination of the amount of backpay due and the right of reinstatement under this Order;*

(c) *Upon request, bargain collectively with Local Union No. 685, Printing Specialties and Paper Products Union, International Printing Pressmen and Assistants' Union of North America, AFL-CIO, as the exclusive bargaining representative of the Respondents' employees at the Tonawanda, New York plant (formerly its Dunkirk plant), excluding office clerical employees, guards, professional employees, and supervisors as defined in the Act;*

(d) Post at their Tonawanda, New York, plant copies of the notice attached to the Intermediate Report and marked Appendix B. Copies of said notice, to be furnished by the Regional Director for the Third Region, shall, after being duly signed by Respondents, be posted by them immediately upon receipt thereof, in conspicuous places, including all places where notices to employees are customarily posted, and be maintained for a period of sixty (60) consecutive days. Reasonable steps shall be taken to insure that such notices are not altered, defaced, or covered by any other material;

(e) Notify the Regional Director for the Third Region, in writing, within ten (10) days from the date of this Order,

* Omitted from the Appendix to the opinion.

what steps they have taken to comply herewith.

-Appendix B (To Board Order)

NOTICE TO ALL EMPLOYEES
PURSUANT TO
A DECISION AND ORDER

of the National Labor Relations Board, and in order to effectuate the policies of the National Labor Relations Act, as amended, we hereby notify you that:

WE WILL NOT discourage membership in LOCAL UNION NO. 685, PRINTING SPECIALTIES AND PAPER PRODUCTS UNION, INTERNATIONAL PRINTING PRESSMEN AND ASSISTANTS' UNION OF NORTH AMERICA, AFL-CIO, or in any other labor organization of our employees, by discharging, laying off, refusing to reinstate, reducing work hours, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of employment.

WE WILL NOT threaten employees with reprisals or make them promises of benefit to discourage membership in or activity on behalf of the above-named or any other labor organization.

WE WILL NOT in any manner interfere with, restrain, or coerce employees in the exercise of the right to self-organization, to form labor organizations, to join or assist the above-named or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in any other concerted activities for the purpose of collective bargaining or other mutual aid or protection; or to refrain from any or all such activities, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a)(3) of the Act.

WE WILL offer the employees listed on the attached "Appendix A" immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges, *and make them and all employees on our Dunkirk payroll on December 3, 1958, whole for any loss of earnings they may have suffered by reason of the discrimination against them.*

*We Will, upon request, bargain collectively with the above-named labor organizations as the exclusive representative of our employees in the appropriate unit described below:*

*All employees at our Tonawanda, New York, plant, excluding office clerical employees, guards, professional employees, and supervisors as defined in the Act.*