**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**SPUN–JEE CORPORATION and the James Textile Corporation, Respondents.**

No. 360, Docket 30899.

United States Court of Appeals Second Circuit.

Argued March 9, 1967.

Decided Oct. 30, 1967.

As Amended on Rehearing Dec. 7, 1967.

Robert S. Hillman, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Glen M. Bendixsen, Atty., N. L. R. B., on the brief), for petitioner.

Charles R. Katz, New York City (Katz & Wolchok, Stuart Linnick, New York City, on the brief), for respondents.

Before LUMBARD, Chief Judge, and WATERMAN and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order, 152 NLRB 943, which found that the Spun-Jee Corporation and the James Textile Corporation violated §§ 8(a) (1) and 8(a) (5) of the Labor Act when they failed to bargain with the Undergarment & Negligee Workers' Union, Local 62, International Ladies' Garment Workers' Union, AFL-CIO, and when they refused to execute a collective agreement entered into by the union and the Allied Underwear Association. We hold that the respondents did not improperly fail to bargain but remand for further consideration the question whether they were unwarranted in refusing to execute the collective agreement. Consequently, we deny enforcement and remand the case to the Board for further consideration.

■ The two respondent corporations were engaged in the textile business in New York City. James purchased the fabric, Spun-Jee cut and sewed it, and James marketed the finished products.

Otherwise, respondents' ownership, management, operations and control of labor relations were totally integrated; hence, the Board was warranted in treating Spun-Jee and James as a single employer. See, Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc., 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965); Sakrete of No. California v. NLRB, 332 F.2d 902 (9 Cir. 1964), cert. denied 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965); NLRB v. A. K. Allen Co., 252 F.2d 37 (2d Cir. 1958).

Since 1955 the union had represented respondents' production, shipping and warehousing employees and, starting in 1958, had bargained collectively with the Allied Underwear Association, a multi-employer bargaining group of which respondents were members. On March 20, 1963, a representative of the association, stressing the economic plight of the industry in the Greater New York area, wrote the union requesting a one-year extension of the existing collective agreement which was due to expire on June 30. The union rejected this proposal on March 28 and indicated that it would seek "various modifications" of the contract.

One month later, on April 29, the parties met and the union presented a list of its demands. A similar session occurred on May 6 with the union giving a somewhat more detailed explanation of its position. James Pillet, the president of both respondents, attended the April 29 and May 6 meetings as a member of the association's negotiating committee. On May 10, however, he resigned from the committee and arranged for a separate meeting with Matthew Schoenwald, the union's business manager. No representative of respondents attended subsequent bargaining sessions held on May 14 and 20.

On May 17, Pillet met with Schoenwald and requested a one year extension of the contract regardless of the outcome of the association bargaining. When Schoenwald replied that respondents would not be treated differently

from other members of the association, Pillet retorted that unless he received an extension, he would have to terminate the present enterprise at the expiration of the current contract, subcontract the production work and move the remaining operations to avoid New York City taxes. Immediately after this May 17 meeting with Schoenwald, Pillet resigned from the association. The record does not reveal whether Pillet's letter of resignation was received before the May 20 bargaining session. On that day, however, the association wrote the union that respondents had withdrawn as of May 17 and the union received this notification after the May 20 meeting.

Following the meeting with Schoenwald, Pillet looked for and eventually located a new site in New Jersey for which he executed a lease on June 14. During late May and early June, Pillet commenced to phase out the New York operations but when questioned by his employees and union representatives, he was evasive and misleading about his intentions. For example, respondents denied any plan to move and, when asked why machines were being dismantled, claimed that business was slow or that the shop was being automated. At the same time, it should be noted that the union probably was not deceived. For instance, when told by Plant Manager Iorio that business was slow, Union Business Agent Shatnoff replied "who is kidding who?" Eventually, on June 18, Pillet stated outright that respondents were going out of business. Two days later, Schoenwald informed Pillet that the union deemed the resignation untimely and that it intended to hold respondents to the new union-association agreement which was subsequently agreed to on July 1. Respondents did not reply and proceeded to discontinue the New York operations. Those employees who were still working on July 2 went on strike and later pickets paraded in front of the New Jersey site. Around July 5, respondents commenced the New Jersey business which corresponded largely to the buying and selling aspects of the New York operation. The bulk of the production work was subcontracted and Spun-Jee has been liquidated. Three of the six New Jersey employees formerly worked in the New York plant.

## I.

■ The first question is whether respondents committed an unfair labor practice by refusing to adhere to the agreement reached July 1 by the association and the union. The answer, in turn, depends on whether respondents effectively withdrew from the association. Multi-employer bargaining associations are established and disestablished by the mutual consent of the employers and the union. Once a multi-employer bargaining relationship has been entered into, unless there is mutual consent, either express or implied, the union, e. g. Publishers' Ass'n of New York City v. NLRB, 364 F.2d 293 (2d Cir.), cert. denied 385 U.S. 971, 87 S.Ct. 509, 77 L.Ed.2d 435 (1966), or an employer, e. g. NLRB v. Sheridan Creations, 357 F.2d 245 (2d Cir. 1966), cert. denied 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967), must effect a timely and unequivocal withdrawal. Respondents' notice of resignation was certainly unequivocal. The question remains of whether it was timely. The Trial Examiner assumed that the withdrawal was untimely and the Board expressly so found.

In *Sheridan Creations*, supra, we upheld the Board's decision that an employer's withdrawal is untimely except on mutual consent once bargaining has begun. Accord, Universal Insulation Corp. v. NLRB, 361 F.2d 406 (6th Cir.), (1966); NLRB v. Tulsa Sheet Metal Works, Inc., 367 F.2d 55 (10th Cir. 1966). Like the employer in *Sheridan*, respondents are attempting to withdraw after attending two bargaining sessions between the union and the association. Furthermore, unlike *Sheridan*, in this case, one and perhaps two further meetings were held, at which respondents were not present, before respondents' resignation was tendered.

Respondents contend that they effected a timely withdrawal because the union only outlined vague requests at the sessions and, therefore, "bargaining" had not begun. They do not show, however, that the initial two discussions in *Sheridan* were any more advanced. See Sheridan Creations, Inc., 148 NLRB 1503, 1504, 1511 (1964). · Anyway, it would seem that once the parties meet and discuss a new contract, "bargaining" has begun, no matter how speculative the discussion is. Respondents further argue that they should be allowed to withdraw up to and including the point when the union's position becomes solidified because, otherwise, they cannot make an informed decision. But, if an employer were allowed to withdraw once the union's demands are crystallized, the "lively possibilities for disrupting the bargaining process" condemned in *Sheridan* would be fostered. In short, respondents' withdrawal was not timely, unless justified by unusual circumstances. Retail Associates, Inc., 120 NLRB 388 (1958); *Sheridan Creations*, supra. Neither the Board nor this court has attempted to define the limits of the "unusual circumstances" exception to the per se rule found in some cases, cf. *Retail Associates*, the apparent source of the rule adopted in *Sheridan Creations*. In *Sheridan* we upheld the Board's rule that, without union consent, withdrawal after multi-employer bargaining had begun is untimely. The Board in Sheridan, 148 NLRB 1503, relied on Kroger, 148 NLRB 569. The rule is said, however, to have originated in *Retail Associates*, where the rule is stated with an additional caveat ("absent unusual circumstances"). The Tenth Circuit in *Tulsa Sheet Metal Works*, supra, while citing *Sheridan*, also inserts this cautionary phrase although no such circumstances were there found. Since neither in *Sheridan* nor *Kroger* were there facts which required consideration under such a caveat, its omission is not necessarily significant of its abandonment. In the case at bar there are the circumstances that the attempted withdrawal followed upon the employer's decision for legitimate economic reasons to close down one complete division of his business and contract out that work.

■ Because the Board has not addressed itself to the question of whether the peculiar facts of this case are "unusual circumstances" within its rule, we find it necessary to remand the case to the Board for consideration of this issue.

Assuming the withdrawal to be untimely, the Examiner found that by bargaining for a month and ten days after the purported withdrawal on the basis that respondents were not members of the association, without concern for respondents' particular problems and without protest to the association, the union had acquiesced in respondents' untimely withdrawal. On the other hand, the Board declined to find acquiescence and stressed the fact that from May 17 on, when Schoenwald refused respondents' request for separate treatment, the union did not alter its position and actually asserted on June 18 that it would hold respondents to the association contract. The difference between the view of the Examiner and that of the Board is that for the former, silence or inaction constituted acquiescence, whereas for the latter they did not.

We have been unable to find any support in the reported cases for a flat rule that silence or inaction does not in any circumstance constitute acquiescence. Such a rule might accord with the essentially consensual nature of the multi-employer relationship. Yet there may exist circumstances which in the conduct of labor-employer relations would make such a hard and fast rule questionable. The Board here has not attempted thoroughly to canvass and express the bases for such a rule and we find it necessary to remand the case for further consideration and explication of the Board's position.

■ Respondents argue that the union exhibited acquiescence when it picketed in New Jersey, indicating that the workers of Spun-Jee were "on strike for a union contract." This conduct alone is not determinative of acquiescence in this

case. See C & M Constr. Co., 147 NLRB 843 (1964). Not only did the picketing occur after the new union-association contract had been agreed to, which somewhat diminishes its relevance, but also it might simply have been designed to encourage adherence to that contract.

■ Respondents complain further that the union acquiesced because it never requested them to execute a "Certificate of Authorization and Assumption" after the association had ratified the agreement. The union's failure so to request, however, may be found immaterial in light of the Examiner's finding that it was the practice in the industry for only some employers to execute this certificate.

## II.

Concerning the General Counsel's charge that respondents violated their duty to bargain by failing to notify and consult the union about plant closing, moving, partial shutdown and subcontracting, the Examiner concluded:

"Pillet, on May 17, 1963, clearly revealed to Schoenwald of the Union that Respondent was considering the possibility of subcontracting and moving and that Respondent was willing to discuss the problems. I am convinced that when the Union learned on May 21 or 22 that Respondents had withdrawn from the Bargaining Association, that the Union knew the Respondents were considering subcontracting and moving operations, and that Respondents would discuss such possibilities. Under such circumstances the facts do not reveal that the Respondents precluded the Union from negotiations or discussions as to the subcontracting or moving, and the Union in effect had sufficient notice of the same."

The Board, however, stating that respondents on May 17 "did no more than suggest the possibility of plant closing or removal, using this to buttress their advancement of reasons of economic hardship as the basis of their request for a year's extention" and citing in particular respondents' month-long concealment of their decision to close down and their failure to inform the union of their new location, as well as "the record as a whole," found §§ 8(a) (5) and 8(a) (1) violations.

We conclude that the Examiner was correct in finding that no violations occurred. From May 17 on, even though the union was on notice that respondents contemplated a move, it never sought arbitration or requested bargaining either singly, which if sufficiently limited would not have constituted acquiescence in the untimely withdrawal, Kroger Co., 148 NLRB 569 (1964), or through the association, which was also an available route. As we stated in Genesco, Inc. v. Joint Council 13, United Shoe Workers of America, 341 F.2d 482, 489 (2d Cir. 1965), "Multi-employer bargaining does not altogether preclude demand for specialized treatment of special problems; what is required, if an employer or a union is unwilling to be bound by a general settlement, is that the particularized demand be made early, unequivocally and persistently." In fact, the union's first action which could conceivably be construed to constitute a request to bargain about anything was the picketing in New Jersey which happened after the new union-association agreement had been entered into.

Although we in no manner condone respondents' attempted secretiveness, given the clarity of Pillet's statement of position on May 17, we hold that the union was not deprived of notice of respondents' plans. Thus, cases such as NLRB v. Johnson, 368 F.2d 549 (9th Cir. 1966), where the employer disclosed his subcontracting plans as a fait accompli, and NLRB v. Rapid Bindery, Inc., 293 F.2d 170, 176 (2d Cir. 1961), where we stated that "conjecture or rumor is not an adequate substitute for an employer's formal notice to a union" are not controlling, for Pillet's statement was a sufficiently formal notice to the union to apprise it of respondents' plans. Compare Southern California Stationers, 162 NLRB 146 (1967). Nor, contrary to what the Board

states, is the failure to disclose the location of the new site decisive. This seems especially so because the Examiner found that the union received knowledge of the location in mid-June. Furthermore, even after June 18 when Pillet explicitly stated that respondents were moving, the union failed to request bargaining but flatly stated that it would stand on the association contract. In fact, possibly because of the contract provisions relating to severance pay and pensions, the union seems not even to have sought negotiation about the effects of discontinuance, about which there plainly is a duty to bargain. NLRB v. Rapid Bindery, Inc., supra at 176; Cooper Thermometer Co. v. NLRB, 376 F.2d 684 (2d Cir. 1967). Nor did the union seek bargaining about transfer of employees to what positions there were available in New Jersey. See *Cooper Thermometer,* supra.

 The union's failure to request bargaining about the cessation of operations, removal, partial shutdown, subcontracting, effects of discontinuance and the transfer of employees constituted a waiver of any rights it may have had. NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L. Ed. 660 (1939); NLRB v. Rural Elec. Co., 296 F.2d 523 (10th Cir. 1961). Therefore, because it is not necessary to decision here, we do not determine whether under the circumstances of this case involving the closing and liquidation of the New York plant for economic reasons, with no indication of anti-union animus, there existed a duty to bargain about plant closing, moving, partial shutdown and subcontracting as distinguished from the effects thereof. Compare, Fibreboard Paper Prods. Co. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), NLRB v. Johnson, supra, NLRB v. American Mfg. Co., 5 Cir., 351 2d 512 (5th Cir.), cert. denied 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966), NLRB v. American Mfg. Co., 5 Cir., 351 F.2d 74 (1965), Note, 74 Yale L.J. 1472, 1478 (1965) with NLRB v. Royal Plating and Polishing Co., 350 F.2d 191 (3rd Cir. 1965), NLRB v. Adams Dairy, Inc.,

350 F.2d 108 (8th Cir. 1965), cert. denied 382 U.S. 1011, 86 S.Ct. 619, 15 L. Ed.2d 526 (1966), NLRB v. William J. Burns Int'l Detective Agency, 346 F.2d 897 (8th Cir. 1965), NLRB v. Rapid Bindery, supra.

### III.

If the Board finds there was no acquiescence in the withdrawal from the bargaining unit and that no "unusual circumstances" existed which justified the attempted withdrawal, it should determine whether the appropriate remedy is the present order that respondents bargain with the union in a unit consisting of their own production, shipping and warehouse employees or some other form of relief. We deny the petition for enforcement of the order and remand the case to the Board for further consideration.