**BROCKWAY MOTOR TRUCKS, DIVISION OF MACK TRUCKS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–1974.

United States Court of Appeals, Third Circuit.

Argued March 28, 1978.

Decided July 19, 1978.

---

Wilbur C. Creveling, Jr., Allentown, Pa., for petitioner.

Paul J. Spielberg, Andrew F. Tranovich, John S. Irving, John E. Higgins, Jr., Carl L. Taylor, Elliott Moore, N. L. R. B., Washington, D. C., for respondent.

Before ADAMS, VAN DUSEN and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Many of the critical problems in contemporary legal discourse arise out of the difficulty of bringing ideals of public law into the basically private sector of community life. That difficulty has both a philosophical and legal dimension. It is necessary to accommodate norms of private right and individualism, fundamental to our society, with principles of public responsibility, which require limitations on the exercise of a purely private will. In jurisprudential terms, legislatures and courts are called upon to crystallize usable standards that reconcile the notions of public duty and individual interest.[1]

One area of labor law reflecting the intricacy of bridging the private and public realms is that of the duty to bargain imposed on parties participating in the collective bargaining process. When a court is asked whether an employer is obliged to meet with a union before making a decision vitally affecting the employees, as we are here, the task of meshing public duty and private purpose is squarely presented. In discussing the scope of the employer's duty to bargain, it is essential to avoid overly simple solutions and instead to reflect the subtle interrelationship between public law principles and conceptions of private right.

## I.

With these concepts in mind, we now address ourselves specifically to the facts of the present appeal, which has emerged from a decision by Brockway Motor Trucks, a division of Mack Trucks, Inc., to close its facility in Philadelphia without first mentioning or discussing the possibility of closing with the affected union. The National Labor Relations Board (NLRB) has concluded that such unilateral action violates the duty to bargain imposed on an employer by the National Labor Relations Act (NLRA). Brockway has petitioned this Court for a review of the NLRB's ruling. At the same time, the Board has filed a cross-application for enforcement of its order that Brockway "cease and desist" from refusing to bargain with the union about the decision to shut down the plant, and that upon request the employer commence bargaining on that subject.[2]

---

1. *Cf.* P. Selznick, *Law, Society, and Industrial Justice* 35–36 (1969). The tension between the private and public realms of social life has been a persistent theme of the classics in political theory, *see, e. g.,* Rousseau, Social Contract (M. Cranston, tran.), and of the writings of contemporary political theorists, *see* J. Shklar, *Men and Citizens* (1969). For a critique of the antinomy in liberal theory between the ideals of individualism and community, *see* R. Unger, *Knowledge and Politics* 81–83, 155–56, 213–22 (1975).

2. The remedy ordered by the Board requires Brockway to bargain, upon request, with the union about the decision to close the Philadel-

Prior to the plant closing, Brockway had a number of facilities, including the one in Philadelphia, that were engaged in the manufacture and sale of trucks.[3] The plant in Philadelphia was utilized for the sale and servicing of new and used vehicles. Employees at the plant were represented by Local 724, International Association of Machinists and Aerospace Workers, AFL–CIO. Brockway and the union negotiated a three-year collective bargaining agreement covering these employees, and the contract expired on September 14, 1975.

No new agreement between the parties was then reached, and an extended dispute ensued. As Brockway's counsel indicated at oral argument, the union commenced to strike the Philadelphia plant on May 26, 1976. The strike continued until the union was notified that management unilaterally had decided, on July 19, 1976, to shut down the facility. It is undisputed that the employer neither consulted the union about the decision to terminate nor gave the union any advance notice of the closing.

Less than one month after Brockway decided to cease operations at its plant, the union filed a charge with the NLRB alleging that Brockway, by failing to bargain about that decision, had violated §§ 8(a)(1) and (5) of the NLRA. The union directed its challenge solely at the employer's action of unilaterally closing the facility.[4]

On September 23, 1976, the NLRB issued a complaint and notice of hearing in which it asserted that, on July 19, Brockway unlawfully had refused to bargain with the union regarding the plant closing. In its answer, Brockway admitted that it had decided unilaterally to shut down the facility and had refused to bargain with the union regarding that matter; it stated that notice had been given to the union on the day after the decision was made.

Both parties entered into a stipulation on December 27, 1976, in which they agreed that certain documents—including the charge, complaint, notice of hearing, answer and stipulation—would constitute the entire record in the case. They also waived all proceedings before an administrative law judge, and submitted the case directly to the NLRB for resolution on the basis of the record and opposing briefs.

It was stated in the stipulation that the discontinuance of operations at Brockway's Philadelphia facility was based solely on "economic considerations." Thus, it is to be assumed that the decision was not the product of anti-union animus on the part of Brockway.[5] There are no facts in the record, however, to explain in any detail the nature, extent or history of the considerations prompting the employer's decision to close its Philadelphia plant. Notably, the record does not make reference to economic *necessity* as a basis of the decision. Moreover, there is no indication that in any specific way the employer's interest in managing the business would have been imped-

---

phia facility and about "the possible resumption thereof." Further, it provides that if the employer agrees to resume its Philadelphia operations, "it shall offer all those in the appropriate unit reinstatement to their former jobs" or, if such jobs no longer exist, to substantially equivalent positions. The order also provides that backpay shall be awarded for the period from the date of the employees' termination to the date Brockway begins to bargain with the union in good faith or until the employees are offered reinstatement, "whichever occurs first, less net earnings during such period . . ."

3. The record indicates that the decision by Brockway which is attacked by the union involved the closing of only one of the employer's facilities, the Philadelphia plant.

4. There is no issue in this case as to whether the employer bargained with the union, after closing, about the effects or consequences of the decision to close the Philadelphia plant. The controversy is limited to the refusal of the employer to negotiate about the decision to close itself.

5. The pertinent portion of the stipulation reads as follows:

Respondent contends that its decision to discontinue operation of its Philadelphia, Pennsylvania facility . . . was based solely on economic considerations. While Counsel for the General Counsel and Charging Party do not contest the accuracy of this assertion for purposes of this Stipulation, they do not agree that it is relevant or material to these proceedings.

ed by bargaining about the matter. For instance, there is no suggestion that any negotiations between Brockway and a third party about the firm's business had been underway or that relationships with suppliers or customers would have been adversely affected by bargaining with the union prior to deciding to close the plant. In short, the only explanation in the record for the unilateral determination by Brockway is the bare statement that the closing was prompted by "economic considerations."

In a decision dated July 21, 1977,[6] the NLRB concluded that Brockway had violated its duty to bargain with the union regarding "wages, hours and other terms and conditions of employment." The Board's opinion is rooted in the premise that an employer who decides to shut down part of its business violates § 8(a)(5) of the NLRA if it fails to bargain with the union about that subject.[7] When an employer's action directly affects the conditions of employment—as does the decision to close a plant—the employer was said by the Board to have a duty to bargain about the action "notwithstanding an employer's contention that such a requirement significantly restricts its ability to manage the business." The reason for such a result, it asserted, is that the union has a right under the NLRA to engage in a "full and frank discussion

regarding such decisions."[8] Further, the Board noted, its finding of a duty to bargain does not compel the parties to come to any substantive agreement, but merely directs a process in which the union has an opportunity to discuss and perhaps influence the employer's final decision.[9]

Brockway challenges the Board's conclusion as contrary to the law of this Court. It also insists that the prevailing view among the Circuits is that there never is any duty to bargain about a partial closing, such as we have here,[10] and that that view should be embraced in this case. In response, the Board urges that Brockway's refusal to bargain about the closing is properly seen to constitute an unfair labor practice. Further, the Board maintains that the opinion of this Court on which Brockway primarily relies—*NLRB v. Royal Plating & Polishing Co.*[11]—is not only distinguishable from the present case, but also should not be read to reach this situation.

## II.

### A.

Ever since the Supreme Court in *NLRB v. Jones & Laughlin Steel Co.*, 301 U.S. 1, 30–40, 46–47, 57 S.Ct. 615, 81 L.Ed. 893 (1937), upheld the NLRA as constitutional, it has been a prime principle of

---

**6.** The Board's decision and order are reported at 230 N.L.R.B. No. 147 (1977).

**7.** The Board was less than clear about the nature of any exception to the duty to bargain enunciated in its opinion. All the Board said was that, in its view, this case is not one in which a "significant investment" or the "ultimate direction" of the company is involved. The Board did not explain the import of these phrases or their meaning in different factual circumstances.

**8.** For this proposition, the Board cited as authority *Ozark Trailers, Inc.*, 161 N.L.R.B. 561, 568, 63 L.R.R.M. 1264 (1966).

**9.** The Board also noted without elaboration that the NLRA requires bargaining by the parties in good faith. For a classic treatment of that requirement, which is not a subject of this appeal, *see generally* Cox, *The Duty to Bargain in Good Faith*, 71 Harv.L.Rev. 1401 (1958).

**10.** A "partial closing" is a closing of one facility by an employer having at least two plants. A variant on the situation of a partial closing is that of a plant relocation, in which one of two or more facilities is shut down and then relocated. Both a partial closing and a relocation decision should be distinguished, in the first instance, from a complete closing of an entire business, which occurs when the employer goes utterly out of business. The Supreme Court has held that when an employer goes totally out of business, its act is not subject to scrutiny as a possible unfair labor practice. *See Textile Workers Union of America v. Darlington Manufacturing Co. v. NLRB*, 380 U.S. 263, 273–74, 85 S.Ct. 994, 1001, 13 L.Ed.2d 827 (1965) ("We hold here only that when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice.").

**11.** 350 F.2d 191 (3d Cir. 1965).

American labor law that the parties to an industrial dispute are not free to act unrestrictedly in their own economic self-interest. The Court in *Jones & Laughlin* observed that "[w]hen industries organize themselves on a national scale, making their relation to interstate commerce the dominant factor in their activities, how can it be maintained that their industrial labor relations constitute a forbidden field into which Congress may not enter when it is necessary to protect interstate commerce from the paralyzing consequences of industrial war?"[12] The authority of Congress in establishing a structure of duties within which the participants in labor controversies are to fit themselves is thus based on an abiding sense of a national need for a system of restraints on unbridled, and potentially destructive, private force.

At the center of the Congressional effort to provide a framework for peaceful labor relations is the idea that collective bargaining between the parties should be encouraged.[13] The NLRA provides affirmative legal protection against the employer's exercise of its power to frustrate the organization of employees for collective bargaining.[14] Also, the Act imposes on employers an enforceable duty to bargain with unions representing appropriate bargaining units.[15]

Congress did not undertake to specify the precise subjects that the parties are obliged to discuss. Rather, § 8(a)(5) of the NLRA, an aspect of the original legislation enacted in 1935, deals only in general terms with an employer's duty to negotiate, saying that it shall be an unfair labor practice for an employer:

. . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).[16]

In 1947 Congress amended the NLRA to include a new section, § 8(b)(3), which imposes a correlative duty to bargain upon labor organizations.[17] In order to clarify the nature of the obligations set forth in §§ 8(a)(5) and 8(b)(3), Congress also enacted § 8(d), which defines collective bargaining as good faith negotiation with respect to "wages, hours, and other terms and conditions of employment."[18]

▮ A matter falling within the scope of § 8(d)—namely, one involving "wages, hours, and other terms and conditions of employment"—is a mandatory subject of bargaining.[19] In practical terms, the elaboration of the identity of mandatory subjects of bargaining is crucial, for such matters must be discussed in bargaining sessions before any unilateral action with respect to them is taken. If, for example, an employ-

---

12. 301 U.S. at 41, 57 S.Ct. at 626.

13. *See id.* at 45, 57 S.Ct. at 628 ("The theory of the act [NLRA] is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the act in itself does not attempt to compel.")

14. *See* § 7 of the NLRA, 29 U.S.C. § 157.

15. *See* § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5).

16. Section 9(a) of the Act states, *inter alia,* that collective bargaining representatives "shall be the exclusive representatives of all the employees" of a bargaining unit, provided that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer . . ."

17. Section 8(b)(3) makes it an unfair labor practice for "a labor organization or its agents" to "refuse to bargain collectively with an employer," so long as the organization is the unit's collective bargaining representative as provided in § 9(a) of the Act.

18. As Section 8(d) provides in pertinent part:
(T)o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . .

19. *See NLRB v. Wooster Division of Borg-Warner Corp.,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958).

er proceeds on its own without submitting a mandatory subject to the bargaining process, it violates its duty under the NLRA, and its professed good faith in so doing will have no bearing upon the legality of its action.[20] Moreover, if one party insists on the inclusion of such a subject in a collective bargaining agreement, the other party is obligated at least to discuss it.[21] The converse of these propositions is also true. A permissive subject of bargaining need not be discussed at the bargaining table, and one party may not compel the other to address it as a condition of executing a collective bargaining agreement.[22]

The range of subjects that courts have held to be mandatory topics of bargaining is rather broad, and includes such diverse matters as compensation,[23] pensions,[24] profit-sharing plans,[25] bonuses,[26] stock purchase arrangements,[27] merit wage increases,[28] insurance schemes,[29] company housing and meals,[30] hours [31] and—the category relevant here—issues of employment security. Subjects touching on the employees' interest in the security of their employment include those of hiring practices,[32] procedures for bidding jobs,[33] methods of selecting employees for layoffs,[34] procedures for promotion or transfer,[35] the operation of an employer's seniority program,[36] policies relating to compulsory retirement,[37] subcontracting out unit work [38] and partial closings.[39]

We shall confine further discussion to the last two areas: subcontracting out unit work and partial closings.

20. See NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

21. Cf. id.

22. See NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

23. See, e. g., Oughton v. NLRB, 118 F.2d 486, 498 (3d Cir. 1941), cert. denied 315 U.S. 797, 62 S.Ct. 485, 86 L.Ed. 1198 (1942).

24. See, e. g., Inland Steel Co. v. NLRB, 170 F.2d 247, 251 (7th Cir. 1948), cert. denied 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949).

25. See, e. g., Kroger Co. v. NLRB, 401 F.2d 682, 687 (6th Cir. 1968), cert. denied 395 U.S. 904, 89 S.Ct. 1742, 1743, 23 L.Ed. 217 (1969).

26. See, e. g., Singer Mfg. Co. v. NLRB, 119 F.2d 131, 136–37 (7th Cir.), cert. denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549 (1941). Cf. NLRB v. Wonder State Mfg. Co., 344 F.2d 210, 212–14 (8th Cir. 1965).

27. See, e. g., Richfield Oil Corp. v. NLRB, 97 U.S.App.D.C. 383, 390, 231 F.2d 717, 724 (1956).

28. See, e. g., NLRB v. J. H. Allison & Co., 165 F.2d 766, 768–69 (6th Cir.), cert. denied 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948).

29. See, e. g., W. W. Cross & Co. v. NLRB, 174 F.2d 875, 878 (1st Cir. 1949). See also McLean v. NLRB, 333 F.2d 84, 87 (6th Cir. 1964).

30. See, e. g., American Smelting & Refining Co. v. NLRB, 406 F.2d 552, 554–55 (9th Cir.), cert. denied 395 U.S 935, 89 S.Ct. 1998, 23 L.Ed.2d 450 (1969) (housing); NLRB v. Lehigh Portland Cement Co., 205 F.2d 821, 823–24 (4th Cir.

1953) (housing); Weyerhaeuser Timber Co., 87 NLRB 672, 25 LRRM 1163 (1949) (meals). But see Westinghouse Electric Corp. v. NLRB, 387 F.2d 542, 550 (4th Cir. 1967) (meals).

31. See, e. g., S. S. Kresge Co. v. NLRB, 416 F.2d 1225, 1230–31 (6th Cir. 1969); Gallenkamp Stores Co. v. NLRB, 402 F.2d 525, 529 (9th Cir. 1968); NLRB v. George P. Pilling & Son Co., 119 F.2d 32, 38 (3d Cir. 1941).

32. See, e. g., NLRB v. Houston Chapter, Associated General Contractors of America, Inc., 349 F.2d 449, 451 (5th Cir. 1965).

33. See, e. g., Perry Rubber Co., 133 NLRB 225, 48 LRRM 1630 (1961).

34. See, e. g., NLRB v. Westinghouse Air Brake Co., 120 F.2d 1004, 1006 (3d Cir. 1941).

35. See, e. g., NLRB v. Century Cement Mfg. Co., 208 F.2d 84, 85–86 (2d Cir. 1953) (promotion); Rapid Roller Co. v. NLRB, 126 F.2d 452, 459–60 (7th Cir.), cert. denied 317 U.S. 650, 63 S.Ct. 45, 87 L.Ed. 523 (1942) (transfer).

36. See, e. g., Industrial Union of Marine & Shipbuilding Wkrs. v. NLRB, 320 F.2d 615, 620 (3d Cir. 1963).

37. See, e. g., Inland Steel Co. v. NLRB, 170 F.2d 247, 251–52 (7th Cir. 1948), cert. denied 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949).

38. The leading case on this topic is Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

39. For the meaning of the term "partial closing," see note 10 supra.

B.

To place Brockway's appeal in the appropriate legal perspective, it is necessary to provide, in some detail, a picture of the evolution of the law relating to an employer's duty to bargain about the decisions to subcontract out work and to close one of a firm's facilities. For in this area there are several doctrinal cross-currents.[40]

The starting point is the Supreme Court's landmark opinion of *Fibreboard Paper Products Corp. v. NLRB.*[41] In affirming decisions by the NLRB and the court of appeals, the Supreme Court there held that "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment" is within the reach of Section 8(d), and thus that it is a mandatory subject of bargaining.[42] The company in *Fibreboard* had become concerned about the high costs of its maintenance operations, and had decided to discontinue the employment of its own maintenance workers and to engage the services of an independent contractor. The Supreme Court wrote that such a decision to subcontract out unit work came "well within the literal meaning" of the statutory phrase, "terms and conditions of employment."[43]

Also, the Court noted, to conclude that such a matter was a mandatory subject of bargaining would promote the basic purpose of the NLRA, which is to encourage the peaceful settlement by the parties themselves of industrial disputes.[44] This position was said to be reinforced by existing practices in industry, which indicated that contracting out is a fit subject for negotiation since many collective bargaining agreements include a clause covering that eventuality.[45]

Shortly after *Fibreboard,* this Court and the Eighth Circuit decided cases in which they distinguished *Fibreboard* factually and did not impose a duty to bargain. in *NLRB v. Royal Plating & Polishing Co.,*[46] we held that there was no duty to bargain about a determination to close one of two plants engaged in the business of metal plating and polishing, since prior to the decision the employer had been suffering from "severe" economic losses for years, and the property on which the plant that was closed was located had been designated by the city's housing authority for redevelopment.[47] Particularly in light of the action by the governmental entity, the Court asserted that there was "no room for union negotiation in these circumstances."[48]

*Royal Plating* distinguished *Fibreboard* on the ground that the subcontracting of concern in *Fibreboard* did not lead to a "change in the economic direction of the company," for the same functions were to be performed by the independent contractor as had been handled by the firm's employees. Also, the employer's decision in *Royal Plating,* unlike the one in *Fibreboard,* was said to entail a major "commitment of capital investment."[49]

The Eighth Circuit in *NLRB v. Adams Dairy, Inc.*[50]—which had been remanded by

**40.** In particular, commentators have tended to stress that there apparently is a tension between the approach of the NLRB—which has favored bargaining with regard to partial closings—and of courts of appeals which often, but not always, have not reached such a result. *See, e. g.,* Comment, *Application of the Mandatory-Permissive Dichotomy to the Duty to Bargain and Unilateral Action: A Review and Reevaluation,* 15 *Wm. & Mary L.Rev.* 918, 935 (1974).

**41.** 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

**42.** *Id.* at 215, 85 S.Ct. at 405.

**43.** *See id.* at 210, 85 S.Ct. 398.

**44.** *See id.* at 210–11, 85 S.Ct. 398.

**45.** *See id.* at 211–12 & n.7, 85 S.Ct. 398.

**46.** 350 F.2d 191 (3d Cir. 1965).

**47.** *See id.* at 193.

**48.** *Id.* at 195.

**49.** *Id.*

**50.** 350 F.2d 108 (8th Cir. 1965), *cert. denied* 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966).

the Supreme Court for reconsideration in light of *Fibreboard*—likewise concluded that the facts of its case were distinguishable from those in *Fibreboard*.[51] In *Adams Dairy,* the company had decided to terminate the distribution of its own milk. The court, in ruling that such a decision was not a mandatory subject of bargaining, said that the choice had contemplated a "basic operational change" in the company, for after it was made, the company's milk trucks were sold, the milk was conveyed to an independent contractor who took title to it and who distributed it along routes of its own choosing, and the dairy retained no operational control over the contractor's performance.[52] Such an arrangement was contrasted to the situation in *Fibreboard,* where the independent contractor performed the same work that previously had been performed by the company's employees with company-owned equipment and the contractor remained under the company's direct control.

Most significantly, *Adams Dairy* noted that the record indicated that bargaining about the matter of concern in fact had taken place before the then-existing collective bargaining agreement came into effect. That was in contradistinction to the situation in *Fibreboard* where—as in the present case—the employer's action occurred in the absence of prior discussion and during contract negotiations when, as the Eighth Circuit put it, "there was little or no excuse for not negotiating the disputed issue . . ."[53]

After *Royal Plating* and *Adams Dairy,* the NLRB took the opportunity in *Ozark Trailers, Inc.*[54] to explain its interpretation of *Fibreboard* in the setting of a partial closing. In *Ozark Trailers,* the Board held that the closing of a plant engaged in the manufacture of refrigerated truck bodies was a mandatory subject of bargaining. It flatly refused to accept the notion that whenever a "basic" change in a business or a management decision to recommit or reinvest funds is involved, such a factor *by itself* is enough to preclude a duty to bargain.[55] The NLRB emphasized that that approach represented an excessively one-sided allegiance to the interests of management, and that the appropriate mode of analysis in deciding what is a mandatory subject of bargaining is to balance the interests of the employer against those of labor.[56] In addition, the Board stressed that, in the circumstances of *Ozark Trailers,* bargaining would likely be efficacious since during the negotiations the union could be expected at least to attempt to alleviate the employer's concern about the costs of production.[57]

The suggestion that the duty to bargain does not exist simply because it would impinge upon the management's prerogative in running a business was unequivocally rejected. In dealing with that contention, *Ozark Trailers* underscored that Congress, in enacting the NLRA, had made the policy decision not to permit employers to remain entirely free to take actions affecting the future of a firm—such as a partial closing—unconstrained by the need to bargain with labor. The Board reasoned that to

51. *See* 350 F.2d at 109.

52. *See id.* at 111.

53. *Id.* at 113. That fact dramatically distinguishes *Adams Dairy* from the present case.

54. 161 N.L.R.B. 561, 63 L.R.R.M. 1264 (1966).

55. As the Board wrote:
With all respect to the Courts of Appeals for the Third and Eighth Circuit, we do not believe that the question whether a particular management decision must be bargained about should turn on whether the decision involves the commitment of investment capital, or on whether it may be characterized as

involving 'major' or 'basic' change in the nature of the employer's business.
161 N.L.R.B. at 566. To the extent that the Board was saying that a *per se* rule limiting the scope of the duty to bargain is not valid, there seems to be no ground for questioning its observation. However, to the degree that the Board was assuming that this Court's decision in *Royal Plating,* note 46 *supra,* stood for a *per se* rule, we strongly disagree with its interpretation.

56. *See* 161 N.L.R.B. at 566.

57. *See id.* at 567–68.

permit employers to close a plant witho[ut]
even advising the union or in any wa[y]
discussing the matter with it would under-
mine the fundamental legislative aim em-
bodied in the NLRA of fostering collective
bargaining.[58]

*Ozark Trailers* emphasized that to hold
that there was a duty to bargain requires
only that the parties participate in discus-
sion, and does not in any way compel them
to reach an agreement about the issue of
the plant closing. If bargaining fails, de-
clared the Board, "the employer is wholly
free to make and effectuate his decision." [59]
Because the employer's ability to act as it
sees fit ultimately remains untrammelled,
*Ozark Trailers* concluded that the employ-
er's discretion to close the plant cannot be
said to be unduly hampered by allowing
employees to bargain about the partial-clos-
ing determination.

After *Ozark Trailers*, there existed a ten-
sion between the approach of the Board
toward the duty to bargain in the partial-
closing context and that of some courts of
appeals. For instance, in a case in which
the evidence suggested that the company
"was faced with the . . . threat of
becoming unable to serve adequately its
principal customer," [60] the Ninth Circuit
held that the removal of a shipyard's facili-
ties to a new location was not a mandatory

t[
th[
be[
er [
orde[
emplo[
money [

In 197[2,]
*ing Co.* [63] t[
cease operati[on]
ject of bargainin[g]
was to take the [
business of manufact[uring]
products." [64] But in su[m]
the Board made clear its vi[ew]
like *Summit Tooling* should be seen [as rep-]
resenting only a limited exclusion from t[he]
duty to bargain about a partial closing.
Thus, in *Royal Typewriter Co.*,[65] the Board
distinguished *Summit Tooling* by saying
that *Summit Tooling* merely had protected
"the prerogative of an employer . . .
to eliminate itself as an employer," and that
in other circumstances, a duty to bargain
persisted.[66]

---

**58.** *See id.* at 568.

**59.** *Id.*

**60.** *NLRB v. Transmarine Corp.*, 380 F.2d 933, 939 (9th Cir. 1967).

**61.** *NLRB v. Thompson Transport Co.*, 406 F.2d 698, 703 (10th Cir. 1969).

**62.** Many other cases by courts of appeals cited by Brockway are also distinguishable from the situation at hand. For instance, there is no indication here, as there was in *NLRB v. North Carolina Coastal Motor Lines, Inc.*, 542 F.2d 637 (4th Cir. 1976) (per curiam), that the company's claim that its decision was economically grounded was sheerly "pretextual." Nor does Brockway's decision involve the closing of one of several distinct lines of business. *Cf. International Union, United Auto. A. & A. Imp. Wkrs. v. NLRB*, 152 U.S.App.D.C. 274, 275–76, 470 F.2d 422, 423–24 (1972). Moreover, as noted in the text, there is no suggestion in the present case of "pressing economic necessity" as the basis of the employer's determination

such as there was in *Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1038–39 n.9 (8th Cir. 1976). *See also NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170, 175 (2d Cir. 1961) (the company's "continued life depended on business which it could no longer do unless it acceded to a legitimate demand made by a customer who conditioned its contract upon [the company's] compliance").

**63.** 195 N.L.R.B. 479, 79 L.R.R.M. 1396 (1972).

**64.** *Id.* at 480.

**65.** 209 N.L.R.B. 1006, 85 L.R.R.M. 1501 (1974), enf'd 533 F.2d 1030 (8th Cir. 1976).

**66.** 209 N.L.R.B. at 1012 n.15. The Board in *Royal Typewriter* also sought to distinguish its prior decision in *General Motors Corp., GMC Truck & Coach Division*, 191 N.L.R.B. 951, 77 L.R.R.M. 1537 (1971), *aff'd sub nom. International U., United Auto. A. & A. Imp. Wkrs. v. NLRB*, 152 U.S.App.D.C. 274, 470 F.2d 422

court reasoned that it could see no significant difference between the facts of its case and of a prior Fifth Circuit decision, *NLRB v. American Manufacturing Co.,*[69] where it had held that there was a duty to bargain before unilaterally terminating the company's motor truck transportation department and engaging the services of a subcontractor. Consequently, the *Winn-Dixie* court concluded that there was a duty to bargain about the matter in question.[70]

Additionally, a violation of the employer's duty to bargain was found by the Sixth Circuit to occur in a situation involving the removal of work from one plant to a new plant of the employer.[71]

In light of the development of the law regarding the employer's duty to bargain

,
le
a
ese
tory
trial
verted
any had
or sound
option of a
nical method
ckaged cheese
her than any op-
ganization." [68]   The

...Motors, the Board held that ...as not obligated to bargain with ...garding an economically-based de- ...sell an independent dealership. In a ...ent from the majority's opinion enforcing the Board's order, Judge Bazelon took the NLRB to task for failing to balance the competing interests of the employer and the employees, and instead for labelling the transaction in question as a "sale" and thus considering it beyond the reach of *Fibreboard*. *See,* 152 U.S. App.D.C. at 278–79, 470 F.2d at 426–28.

In *Royal Typewriter*, without recognizing the conflicting viewpoints over its approach in *General Motors*, the Board simply said that *General Motors* did not overrule *Ozark Trailers* and other decisions "in which the Board, notwithstanding court decisions to the contrary, held that an employer operating two or more plants was obligated to bargain with respect to a decision to close one of those plants." 209 N.L.R.B. at 1012. It should be noted that in *Royal Typewriter*, the Board, because of the passage of time, ordered no remedial relief with respect to its finding of a violation of § 8(a)(5) of the NLRA, and that for that reason the court of appeals found it unnecessary to discuss such finding. Furthermore, the Eighth Circuit took the opportunity in its opinion to reject the NLRB's pro-bargaining stance set forth in *Ozark Trailers*. *See* 533 F.2d at 1039.

The Board's position in *New York Mirror, Division of Hearst Corp.,* 151 N.L.R.B. 834, 58 L.R.R.M. 1465 (1965), is also not contrary to that taken by the NLRB in the present case. For in *New York Mirror*, the Board applied the principle that, even though unilateral actions by an employer may contravene congressional policy, that "do(es) not foreclose the possibility that there might be circumstances which the Board could or should accept as excusing or justifying (such) unilateral action   .   .   ."

151 N.L.R.B. at 841. In that case, the Board noted that it was undisputed that the employer's decision to shut down operations had been "prompted solely by pressing economic *necessity*" (emphasis added), and that the employer had fully met its obligation to bargain with the union about the *effects* of the plant shutdown.

**67.** 361 F.2d 512 (5th Cir.), *cert. denied* 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

**68.** *Id.* at 515.

**69.** 351 F.2d 74 (5th Cir. 1965). *Cf. Town & Country Manufacturing Co. v. NLRB,* 316 F.2d 846 (5th Cir. 1963).

**70.** However, in view of the fact that "for good and sufficient reasons," the court thought that Winn-Dixie would "undoubtedly refuse to reestablish such operations and that to bargain with respect to such reestablishment would be a mere 'exercise in futility,'" the court declined to enforce the order that the employer bargain with the union. 361 F.2d at 517.

**71.** *See Weltronic Co. v. NLRB,* 419 F.2d 1120, 1122–23 (6th Cir. 1969), *cert. denied* 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1970) ("The Board held that the company violated Section 8(a)(5) and (1) of the Act by transferring unit work from its Eight Mile plant to its Telegraph plant without first notifying the union and giving it an opportunity to bargain   .   .   .   . We agree with the Board that the company had the statutory duty to give the union the opportunity to bargain about the removal of the plant central work under the circumstances here shown.") *Cf. NLRB v. Amoco Chemicals Corp.,* 529 F.2d 427 (5th Cir. 1976) (involving a unilateral reduction of wages and ultimately the phasing out of operations at a terminal).

about subcontracting and partial closings, it seems fair to say that the NLRB has taken a pro-bargaining stance that is at odds with the results reached by—and the language in—the opinions of several courts. Other tribunals have reached the conclusion that a duty to bargain does obtain when an employer shuts down an operation, notwithstanding the claims by employers that such a result impedes their freedom to manage a business. Although in this area a variety of cases have singled out a number of factors for consideration, such as the immediate pressures faced by an employer, no overall framework for their systematic analysis in terms of the governing statutory principles has yet been adopted.

### C.

The Congressionally-mandated process of collective bargaining may be viewed essentially as a compromise between two antithetical and immoderate approaches to the respective roles of public duty and private right. On the one hand, the bargaining process is designed not to interpose government as the central actor in labor relations, but rather to preserve intact the liberty of the parties to agree by themselves on the substantive terms governing their interaction. On the other hand, collective bargaining was seen by the Congress that enacted the NLRA as a rejection of an excess of private economic freedom, an excess which was considered to pose a substantial danger in the setting of our modern, highly independent economy.

To the degree that the governmentally-supervised process of collective bargaining represents such a compromise, it also may be conceived to be in the mainstream of American life and thought. For ours remains essentially a pluralistic society that is respectful of the value of the pragmatic adjustment of competing interests. Collec-

tive bargaining is best seen in the context of such tendencies, for it is ultimately based on a willingness of the parties to pursue common ends in a spirit of cooperation while remaining cognizant of their differing goals.[72]

When a court is asked, as we are, to determine whether an employer has a duty to engage in collective bargaining before making a decision to shut down a plant based solely on unspecified "economic considerations", it has a choice between two opposite types of approaches. First, it can advance one of the extreme positions implicitly rejected by the theory of collective bargaining, and say either that the preeminence of public duty is such that the employer *always* has an obligation to bargain about a partial closing, or, in the alternative, take the position espoused by the dissent that the status of the employer's private interest is such that there *never* is a responsibility to bargain in such a situation. This first type of analysis, grounded in the adoption of a *per se* rule, we explicitly reject. The second, more reasonable method, which is more responsive to the values of collective bargaining, is to begin with the statutory commitment to collective bargaining and to proceed to balance the parties' interests in the decision at issue. It is this second course that we adopt here.

#### 1. *The Parties' Arguments: the Per Se Approach*

Underlying Brockway's position is the conception that when a decision by an employer affects in a major way the structure of a firm, as does a partial closing, and when the closing is not colored by the presence of anti-union sentiment, as to which there is no issue here, the employer should be able to make such a determination without previously advising its employees or bargaining with them about it.[73] To but-

---

72. *See* Aaron, *Dispute Settlement: the Grievance Procedure and the Role of Voluntary Arbitration,* in *Labor in a Changing America* 211, 212–14 (W. Haber ed., 1966) (discussing the relationship between the process of collective bargaining and basic values in American society, and arguing that collective bargaining is a

reflection of the ideal of compromise in our pluralistic community).

73. Brockway's counsel summarized the point at oral argument by maintaining that once the stipulation is made that a partial closing is

tress its contention, Brockway points to remarks in *Royal Plating* that the employer's decision in that case gave rise to a "major change" in the affected company. That language, Brockway urges, supports its position that whenever such a change is contemplated by the employer, as it is when a partial closing is considered, no duty to bargain exists.[74]

The major premise of the Board's view, in sharp contrast to Brockway's, is that an employer has a duty to bargain about a decision to close one of its facilities, for such an action intimately affects the interests of the employees and is the sort of subject that the NLRA was designed to reach. However, at oral argument, the Board appeared to allow for at least one class of situations arising in a partial closing context where there is no duty to bargain, namely, when an employer elects to terminate completely a discrete line of its business.[75]

Thus, Brockway commences by assuming that the private interest of an employer is so inviolable that when a partial closing is predicated on "economic considerations," whatever they may be, there can be no duty to bargain about it. And the NLRB starts by postulating that whatever the specific circumstances, there normally is a public-law imposed duty to bargain about a partial closing, although that obligation may disappear when, for example, an employer de-

cides to shut down entirely a distinct line of business.

The striking characteristic of these two positions is that they are quite extreme. Both tend to posit a *per se* rule—each being the mirror image of the other—relating to the duty to bargain about partial closings. As such, they ignore the guidance of the Supreme Court in *Fibreboard*, which by its example counselled a practical, balancing approach to the problem of articulating the scope of the employer's duty to bargain under the NLRA.[76]

As for Brockway's argument, it rests principally upon an attempt to read *Royal Plating* as expounding the proposition—indeed, the *per se* rule—that an employer need never bargain about an economically-based decision to close one of its facilities. Yet *Royal Plating* does not stand, explicitly or implicitly, for such a rule or for any principle other than that directly stated in it, namely, that "an employer faced with the *economic necessity* of either moving or consolidating the operations of a *failing business* has no duty to bargain with the union respecting its decision to shut down." (emphasis added)[77] Saying that there is no duty to bargain about a partial closing when the employer is faced with the "economic necessity" of moving or of otherwise restructuring the operations of a "failing business" is a far cry from indicating that an employer has no duty to bargain about a partial closing when its action is founded on

"economic" in nature, the statutory duty to bargain disappears.

**74.** The language in *Royal Plating*, 350 F.2d 191, 196 (3d Cir. 1965), on which Brockway principally relies is as follows:

There is no question but that the decision to terminate was made for economic reasons. The decision involved a major change in the economic direction of the Company. 'Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control . . . .' *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 217 [85 S.Ct. 398, 13 L.Ed.2d 233] . . . . (1964) (concurring opinion of Mr. Justice Stewart). . . . We conclude that an employer faced with the economic necessity of either moving or consolidating the operations of a failing business

has no duty to bargain with the union respecting its decision to shut down.

**75.** The termination of an entire line of business was analogized by the NLRB to the termination of an entire business, as to which there is no duty to bargain. *See* note 10 *supra*. Also at oral argument counsel for the NLRB noted that when a company has a history of severe financial losses, its case might be given special consideration. Yet counsel for the Board repeated that, in general, the Board's position is that an employer has a duty to bargain about a decision to close a portion of its facilities.

**76.** *See* 379 U.S. at 211–14, 85 S.Ct. 398. *See also Ford Motor Co. v. NLRB*, 571 F.2d 993, at 999 (7th Cir., 1978).

**77.** 350 F.2d at 196.

"economic considerations," whatever they may be.

The language in *Royal Plating* on which Brockway seeks in particular to rely [78] is misinterpreted when read as encompassing the notion that simply because an operational change like a partial closing is contemplated by an employer for undefined economic reasons, no duty to bargain obtains. Rather than saying that, the panel in *Royal Plating* took pains to distinguish its factual situation—where there was an economic necessity of closing and the employer's business was failing—from that in *Fibreboard.*[79]

Moreover, *Royal Plating* explicitly concentrated on the need, in deciding what is a mandatory subject of bargaining, to weigh the competing interests of the employer against those of the employees.[80] In so doing, the opinion noted that the employer's decision to cease operations at one of its plants resulted only after a prolonged period of severe financial loss. Further, it was emphasized that the action of a municipal housing authority, which had designated for redevelopment the land on which the plant was located, rendered the prospect of bargaining a pointless one.[81] There would have been no value, the Court in effect was indicating, for the employer to have bargained about a decision utterly beyond its control. In light of these circumstances— and there is no suggestion in the record here of anything comparable—this Court held that there was no duty to bargain about the partial closing.[82]

---

78. *See* note 74 *supra.*

79. *Royal Plating* cited Justice Stewart's concurring opinion in *Fibreboard*, 379 U.S. at 203, 85 S.Ct. 398, in which the limits of the Supreme Court's holding were underscored. In his concurring opinion, Justice Stewart wrote, *id.* at 223, 85 S.Ct. at 409:

Decisions concerning the volume and kind of advertising expenditures, product design, the manner of financing, and sales, all may bear upon the security of the workers' jobs. Yet it is hardly conceivable that such decisions so involve 'conditions of employment' that they must be negotiated with the employees' bargaining representatives.

In many of these areas the impact of a particular management decision upon job security may be extremely indirect and uncertain, and this alone may be sufficient reason to conclude that such decisions are 'with respect to . . conditions of employment.' Yet there are other areas where decisions by management may quite clearly imperil job security, or indeed terminate employment entirely. An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control.

Just as the situation in *Fibreboard* did not involve one of the types of actions by an employer singled out by Justice Stewart, the present case does not include such actions—such as an advertising decision, a determination to utilize labor-saving machinery, or a choice to go out of business entirely. And it appears inappropriate to read Justice Stewart's concurrence so broadly as to find in it a statement of the *per se* rule that there shall be no duty to bargain in a partial closing context, for such a reading seems directly at odds with the concurring opinion's careful choice of language and its particularized reasoning.

80. As was stated in *Royal Plating*, 350 F.2d at 195, with regard to determining the scope of the duty to bargain:

(I)n each case the interests of the employees and the purpose of the National Labor Relations Act in securing industrial tranquility must be carefully balanced against the right of an employer to run his business.

This language in *Royal Plating & Polishing*, and the method of analysis in the case, demonstrate the fallacy of the dissent's reading of that opinion. The dissent apparently reads *Royal* to stand for the proposition that when an employer closes a plant for economic considerations, it has no duty to bargain. *Royal* explicitly does not embrace such a *per se* rule.

In addition, the dissent misreads our interpretation of *Royal* by saying, at p. 743, that the "majority indicate that the case stands for the extremely narrow proposition that bargaining is mandatory except when economic conditions are so severe that a move is a financial necessity and negotiation would serve no rational purpose." We do not claim that *Royal* reached beyond the facts of its case, as we have stressed in the text; indeed, it is for that reason that the *per se* rule espoused by the dissent cannot find support in *Royal.*

81. *See id.* ("There was no room for union negotiation in these circumstances.").

82. If the panel in *Royal Plating* had been willing to adopt a *per se* rule, which it was not, it would have served little purpose to develop, in great detail, the specific facts of the case and to weigh the competing interests of the affected parties.

Since *Royal Plating* does not lend support to the *per se* rule advanced by Brockway, as well as by the dissent, the core of such an argument cannot stand.[83] However, at the same time, we decline to adopt the opposing *per se* rule.

Although it is surely the case, as the NLRB suggests, that the employees' keen interest in the possibility of a partial closing must not be ignored, it is equally true that that consideration should not be so highlighted as to blur the countervailing interests of the employer. One of the major norms governing the operation of the federal labor laws is that both sides of the controversy, the employer's and the employees', should be seen as crucial, and one should not be exalted to the exclusion of the other. As the Supreme Court stated in *John Wiley & Sons v. Livingston:*[84]

> The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.

In view of the principles of *Fibreboard, Royal Plating and Wiley*, then, a *per se* rule covering this appeal cannot be accepted.

It might be suggested that the balancing of opposing interests in *Royal Plating* was not sufficiently complete. Yet whatever may be thought of such a matter—which is not before us—the point remains that *Royal Plating* by its very method of analysis repudiates the notion, advanced by Brockway here, that a unitary rule covering a large category of actions by an employer is a suitable means of resolving the question of the scope of the duty to bargain. *But cf. International Union, United Auto. A. & A. Imp. Wkrs. v. NLRB*, 152 U.S.App.D.C. 274, 276–77, 470 F.2d 422, 424–25 (1972) (apparently reading *Royal Plating* to stand for the broad rule that when a substantial portion or a distinct line of an employer's business is involved, no bargaining about the subject of the employer's decision is required).

**83.** For another expression of the view that a partial closing is the type of decision that, as a *per se* matter, management should be allowed to make without first advising the union or bargaining with it, *see* Comment, 'Partial Terminations'—A Choice Between Bargaining Equality and Economic Efficiency, 14 *UCLA*

## 2. The Preferred Approach to the Duty to Bargain

Having rejected a *per se* analysis of the duty to bargain about a partial closing, we necessarily encounter the task of elaborating an alternative. In considering a broader approach, we must contemplate the theory of collective bargaining embodied in the NLRA: a commitment to the efficacy of a framework of discussion and compromise between the parties to labor disputes. Direct negotiations by the disputants is viewed as helpful both to the nation, which thereby can be spared to some extent the disruptive products of a lack of communication between labor and management, and to the participants themselves, who thereby are put in a position of listening to the other side and understanding, if not agreeing, with the opposing view.

In the abstract, the aims of collective bargaining would be furthered by requiring an employer to negotiate with a union before deciding irrevocably to close down a plant. Such a requirement would lead to some discussion—however brief it may be—between the parties, and would allow them in advance of a *fait accompli* by one or the other to comprehend the factors motivating each of them. It would at least help foster

*L.Rev.* 1089 (1967). The main weakness of that Comment's argument is that it is insensitive to the countervailing interests of the employees in a decision immediately affecting their fortunes. *Cf. id.* at 1104–06 & n. 85. Also, since the position taken in the UCLA Comment appears to rest on the notion that the likelihood of an economically "rational" decision would be enhanced by permitting the employer to decide on its own whether to close a plant, it is striking that the Comment avoids noticing that the most rational decision is one that takes into account all possible outcomes and their costs. By sitting down with the union and discussing, even briefly, the decision to close a plant, an employer would likely become more fully informed about the nature of such a decision. Thus, after bargaining with the union, it would seem as a general matter that an employer could make a more rational judgment about the wisdom of a partial closing.

**84.** 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964).

respect for the role of each side as a subject in the controversy, and not as a mere object to be treated in accordance with the other's will. It would, in short, tend to promote the realization of the NLRA's basic purpose, which is to advance the peaceful resolution of disputes in industrial relations.[85]

Further, the act of closing a plant appears to come within the literal language of the statute in that it concerns "terms and conditions of employment." This is so for the same reason expressed in *Fibreboard* in support of the proposition that the subcontracting decision there came within the ambit of the statutory phraseology—namely, it usually, and rather quickly, leads to the termination of at least some employees. As *Fibreboard* stated:

> The subject matter of the present dispute is well within the literal meaning of the phrase 'terms and conditions of employment.' . . . A stipulation with respect to the contracting out of work performed by members of the bargaining unit might appropriately be called a 'condition of employment.' *The words even more plainly cover termination of employment which, as the facts of this case indicate, necessarily results from the contracting out of work performed by members of the established bargaining unit.* (emphasis supplied) [86]

Just as subcontracting is likely to lead to the termination of employment, so, too, will the closing down of an employer's plant—and thus the latter act "might appropriately be called a 'condition of employment'."

Accordingly, it would seem that there is an initial presumption, founded on statutory purposes and language, that a partial closing is a mandatory subject of bargaining. However, as earlier pointed out, any such presumption should not be construed as a *per se* rule, as the dissent appears to do. Rather, the main point is that there seems to be no justification for drawing any bright line between a partial closing situation, as to which there is decisional disagreement regarding the duty to bargain, and the subcontracting situation of *Fibreboard*, where the Supreme Court held that there was a duty to bargain. With regard to both matters, bargaining would serve an important statutory function.

The next and crucial step in the analysis, following the lead of *Fibreboard,* is to focus on the facts of each case in determining whether there is a duty to bargain about the decision to close a plant. Such a particularistic inquiry is especially salutary as a practical matter since it directs the court's attention to the interests of each of the parties.

Of chief concern to the employees is the prospect of losing their jobs. It is in fact difficult to imagine any result of a decision by the employer about which labor would be more highly sensitized.[87]

Because of that, it seems realistic, as *Fibreboard* indicated, to suppose that the union would endeavor in the course of discussion to seek to persuade the employer to alter its decision to close the plant.[88] In

---

**85.** *Cf. Fibreboard, supra,* 379 U.S. at 210–11, 85 S.Ct. 398.

**86.** 379 U.S. at 210, 85 S.Ct. at 403.

**87.** The NLRB well expressed the nature of the employees' interest in a partial closing determination in *Ozark Trailers,* note 54 *supra,* 161 N.L.R.B. at 566:

> For, just as the employer has invested capital in the business, so the employee has invested years of his working life, accumulating seniority, accruing pension rights, and developing skills that may or may not be salable to another employer. And, just as the employer's interest in the protection of his capital investment is entitled to consideration in our interpretation of the Act, so too is the em-

ployee's interest in the protection of his livelihood.

**88.** As the Supreme Court wrote in *Fibreboard,* 379 U.S. at 214, 85 S.Ct. at 404:

> [I]t is contended that when an employer can effect cost savings . . . by contracting the work out, there is no need to attempt to achieve similar economies through negotiation with existing employees or to provide them with an opportunity to negotiate a mutually acceptable alternative. The short answer is that, although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant sub-

particular, to the extent that Brockway's decision to shut down one of its facilities is the result of high costs of production, it is possible that the union might agree to changes that would reduce labor expenses and thereby alter the calculation that led to the employer's determination in the first place. Indeed, labor history is replete with instances where a union has cooperated actively with an employer to keep a company financially afloat and thus to prevent the closing of a facility and the loss of jobs. For example, in the clothing industry, representatives of labor have acted "to help employers who were in trouble and whom the union wished to save."[89] Also, the steel industry has witnessed the cooperative spir-it of labor in union-sponsored programs to reduce the cost of production and to return a percentage of wages to the employer as a loan to the company.[90]

Even if the union does not undertake such acts in bargaining about the decision to close the plant, it might still be able to avert the closing by convincing the employer that such a step would cost it more in terms of post-termination expenses, as in severance pay, than it would save. And even if the employer were to remain intransigent, the union could at least attempt to make suggestions about the decision's timing and implementation in order to moderate the closing's impact on the work force.[91]

jecting such issues to the process of collective negotiation.

**89.** S. Slichter, J. Healy & E. Livernash, *The Impact of Collective Bargaining on Management* 845 (1960). For a fuller discussion of the union's provision of expert help to the employer by means of union business agents or technicians, *see id.* at 846–51. As it is written, *id.* at 847:

The most common reason for the extension of expert help by union business agents and technicians is to save the jobs of union members, as when the Amalgamated Clothing Workers cooperated with various firms in the high-cost Chicago clothing market to help them meet competition from newer, low-cost markets, and when the UAW helped Willys-Overland change its wage payment system to get its costs down.

According to Slichter, *et al., id.* at 849, the two main types of help that a union may offer management when the latter is in trouble financially are technical and political assistance. Its technical assistance involves suggesting ways to achieve reductions in production costs. As to political help, it is said, *id.:*

Much of the union's help may be political—convincing the employees in the plant that their own security requires them to accept certain changes and assuring them that reasonable protection is given to their interests. In the men's clothing industry the union finds that newly-organized firms are frequently overstaffed, with too many workers on day work, and that the earnings of pieceworkers are too low. Part of the union's problem is to find ways of reducing excess staff as efficiency improves. Sometimes this can be done by not replacing those who resign.

The sorts of union assistance to management that Slichter, *et al.,* discuss are temporary in nature, and designed to aid the employer in overcoming certain specific difficulties; after the problem is alleviated, the union generally withdraws its special aid. However, it is also possible for a more formal, permanent structure, involving the union's rank and file, to be established as a result of union-management cooperation. For a discussion of that possibility, *see* E. J. Lever & F. Goodell, *Labor-Management Cooperation* (1948).

**90.** *See* C. Golden (then-Regional Director of the Steelworkers Organizing Committee) & H. Ruttenberg, *The Dynamics of Industrial Democracy* 269 (1942) ("Threatened bankruptcy and abandonment of the plant present to workers and management alike a common misfortune and challenge, and quickly overcome the resistance of each to union-management co-operation. . . . When the Federal Steel Company, employing a thousand workers, was on the verge of going out of business in August, 1938, the union proposed a program to reduce costs, and the men returned a percentage of their wages as a loan.") For other early examples of such cooperation, *see id.* at 263–94.

**91.** *Cf. Ozark Trailers,* note 54 *supra,* 161 N.L.R.B. at 570 ("(W)hile meaningful bargaining over the *effects* of a decision to close one plant may in the circumstances of a particular case be all that the employees' representative can actually achieve, especially where the economic factors guiding the management decision to close or to move or to subcontract are so compelling that the employee concessions cannot possibly alter the cost situation, nevertheless, in other cases the effects are so inextricably interwoven with the decision itself that bargaining limited to effects will not be meaningful if it must be carried on within a framework of a decision which cannot be revised.) *See generally* Rabin, *Fibreboard and the Termination of Bargaining Unit Work: the Search for Standards in Defining the Scope of the Duty to Bargain,* 71 *Colum.L.Rev.* 803, 823–26 (1971)

It might be said, in response, that the union's interest in being able to bargain about the employer's decision does not have the same weight in this case as it did in *Fibreboard,* since the decision to close one of Brockway's facilities is of a different sort than the determination to contract out unit work. For, so it might be argued, the present choice implicates complex issues of a managerial nature about which labor has no expertise and therefore cannot be expected to make constructive suggestions in the course of bargaining.

The weakness of such an argument is that it paints with too broad a brush. Like any important action by an employer, including that of subcontracting, the decision to close a portion of an employer's operations has many components. With regard to some aspects of an employer's decision, the union perhaps may not be an expert or, even, a particularly helpful interlocutor. But that observation does not in any way defeat the proposition that with respect to other aspects of such a determination—especially those bearing upon the production costs of labor and the labor-related expenses involved in carrying the decision into effect—the union is fully apprised of relevant and important facts, and could well make a contribution that might enable the employer to keep the plant in question economically viable.[92]

As *Fibreboard* pointed out, one indicator that bargaining might be useful is the frequency with which parties to labor-management contracts include clauses in their agreements bearing on such a matter.[93] In *Fibreboard,* the Supreme Court referred to a Department of Labor report indicating that about one-fourth of the contracts reviewed had some form of limit on subcontracting.[94] Similarly, it would seem apposite here to note that a Department of Labor study shows that about 21.5% or slightly more than one-fifth, of the contracts under consideration contained a clause dealing with the closing of a plant or its removal from its present location.[95] Although such statistics are not determinative, they are indicative that the decision to shut down a facility like Brockway's plant in Philadelphia is the sort of matter as to which bargaining may well be helpful.

The fact that collective bargaining agreements often include clauses dealing with a plant closing or removal might be said to indicate that there is less of a need to impose a *statutory* duty to bargain about that subject. However, even assuming that this is a valid argument in general, it misses the mark in the present case, for the contract between the parties here—even if it contained such a provision, and the record includes no evidence one way or the other— had lapsed at the time that the employer unilaterally decided to close the facility. In addition, *Fibreboard* does not permit the conclusion that the relatively common appearance of contractual clauses about a certain subject makes the statutory duty to bargain about it any less important. To the contrary, *Fibreboard* stated that the frequent appearance of contractual provisions covering a specific subject constitutes affirmative evidence that such a subject is the type of issue as to which bargaining should be thought useful.[96]

---

(hereinafter referred to as *Fibreboard and the Termination of Bargaining Unit Work*).

**92.** In addition, the value of collective bargaining cannot be measured solely in terms of the possibility of an alteration in the employer's decision to close the facility. Merely by sitting down together to consider the matter, the employer and employees may achieve important aims, including the enhancement of the sense that problems confronting one of them also intimately concern the other. Even if no immediate results flowing from such an awareness of their community of interests become evident, the value of fostering that attitude be-

tween the parties should not be underestimated.

**93.** *See* 379 U.S. at 211, 85 S.Ct. 398.

**94.** *Id.* at 211–12 & n.7, 85 S.Ct. 398.

**95.** *See* Rabin, *Fibreboard and the Termination of Bargaining Unit Work,* note 91 *supra,* at 822 & n.83.

**96.** *See* 379 U.S. at 211, 85 S.Ct. at 403 ("Industrial experience is not only reflective of the interests of labor and management in the subject matter but is also indicative of the amena-

It is, of course, not enough to say that the employees have a strong interest in bargaining and that bargaining may well be efficacious; it is also appropriate to consider closely the employer's countervailing interests. In this case, Brockway argues that its freedom to determine the company's direction would be excessively hindered by holding that it has a duty to bargain about the decision to close the plant.[97]

■ We cannot accept the employer's suggestion that imposing on it a duty to bargain would necessarily strip it of its management prerogative. Nothing in a holding that the employer has a duty to bargain about the partial closing by itself would impinge on the employer's freedom ultimately to determine whether to close the facility. Rather, all that such a conclusion would require is that the two sides discuss the matter at the bargaining table. Should the parties fail to reach an agreement, Brockway could then go ahead with its plan to close the plant.[98]

■ Additionally, the record here is devoid of support for the employer's assertion that its freedom would be unacceptably constrained by bargaining. Specifically, there is no evidence to suggest that bargaining about the decision to close would be fruitless or unfair to the employer, either because of an action by some third party— such as a condemnation of the employer's property by a municipal housing authority, as in *Royal Plating*[99]—or of the dire financial straits of the company. There is, for instance, nothing in the record indicating a history of severe losses on the part of Brockway. At oral argument, Brockway's counsel conceded that there was no evidence that the firm was in financially straitened circumstances or that it was economically required to shut down the Philadelphia facility.[100] Nor is there any indication in the record of the need to restructure the company in order for it to remain in business.[101] There is also not the slightest

**97.** Brockway's claim must be seriously weighed, for § 8(d) of the NLRA was not designed to encroach unduly on the employer's "freedom to manage the business." *Id.* at 213, 85 S.Ct. 398.

**98.** To say that the parties have a duty to bargain does not in any way prejudge the question of when that duty to bargain arises, or whether a certain course of bargaining is in good faith. Those are separate questions that have to be addressed in appropriate cases. However, the requirement of bargaining, as we see it, is not designed to hamstring the employer or to delay unduly its effectuating the decision to close the plant. Flexibility is a necessary aspect of a bargaining requirement.

Further, to say as the dissent does, at pp. 747–748, that because complex issues relating to the extent and nature of bargaining arise whenever collective bargaining occurs, the duty to bargain in this case should not be found to exist at all, is to assert a *non sequitur*. The matters are analytically distinct. The argument of the dissent would have us avoid squarely facing the issue in this appeal relating to the imposition of a duty to bargain because of difficulties that may arise in other, future cases. No justification for such a method is provided.

**99.** There is no suggestion in the record of any situation like that in *Royal Plating* in which a

bility of such subjects to the collective bargaining process.").

municipal authority made inevitable the closing of the plant.

**100.** Despite the concession by Brockway's counsel at oral argument, the dissent posits, at p. 749, as one of the central inferences on which it relies the notion that "[o]ne can reasonably infer that in the absence of anti-union animus, a profit-maximizing company, stipulated to be acting solely for economic reasons, will not close its facility in a major metropolitan area of the nation unless, in its judgment, the economic reasons are so severe as to mandate such action." This speculative proposition is unsupported by any evidence in the record. Moreover, it appears to be merely a circular proposition lacking in independent analytical force; all it seems to say is that when an employer chooses to close a plant for "economic" reasons, the reasons must necessarily be strong enough to prompt him reasonably to close the plant.

**101.** *Cf. International Ass'n of Machinists & Aerospace Workers v. Northeast Airlines, Inc.,* 473 F.2d 549, 551, 557 (1st Cir.) *cert. denied* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972) (the company "asserts without contradiction that this (merger) is its last chance for survival"; "(t)he economic necessity for a merger cannot be eliminated by bargaining . . ."); *NLRB v. Transmarine Navigation Corp.,* 380 F.2d 933, 939 (9th Cir. 1967) (". . . the Company was faced with the . . . threat

hint that management negotiations with another entity, such as a potential partner, purchaser or other party, would be disrupted or made substantially more difficult by holding that the partial closing is a mandatory subject of bargaining.[102] The contention that Brockway's managerial position would be unacceptably hampered by imposing a duty to bargain about the decision to close the plant is thus, in the end, merely a speculative assertion unsupported by the evidence.

Brockway's argument comes down to the proposition that the stipulation that the partial closing was due to "economic considerations" is, in itself, sufficient to forestall imposition of the duty to bargain. Such a contention presumes that there exists a rule that an employer need not bargain about a partial closing so long as there is no anti-union animus and whenever the decision is induced by economic considerations, regardless of the nature of such considerations. As we have noted, not only is there no such *per se* rule in this Circuit, but also it is contrary to the analysis of *Fibreboard*.[103] Moreover, it is inconsistent with the purpose of the NLRA, which is to establish a framework of bargaining so as to allow for the peaceful resolution of industrial controversies and, additionally, to foster the dissipation of labor disagreements before they become open disputes.[104]

To conclude that Brockway was not under an obligation to bargain solely because its decision was based on unspecified "economic considerations" might well disrupt the structure of collective bargaining contemplated by the NLRA. It would unduly diminish the scope of the employer's public duty by overly protecting the assertion of its private interest. And it would predictably chill future bargaining by the employees' representatives who would have reason to fear that, in response to aggressive negotiation, an employer could simply shut down one of its plants and be protected by an exclusion from the responsibility of bargaining about that decision.

■ Yet, just as we decline to say that there is no duty to bargain when a decision to close is based on unspecified "economic considerations," it likewise appears inappropriate to enforce an order predicated on an unfair labor practice when we do not know with specificity what the circumstances surrounding the employer's decision to close its facility actually were. The somewhat enigmatic phrase, "economic considerations," is of little help in the process of ascertaining whether the employer's interests in this case were in fact of a magnitude and immediacy that would make unacceptable and unfair the imposition of a duty to bargain.

Because the precise nature of the conditions leading to Brockway's decision is not

of becoming unable to serve adequately its principal customer").

**102.** Cf. *International Ass'n of Machinists & Aerospace Workers v. Northeast Airlines, Inc.,* 473 F.2d 549, 557 (1st Cir.) *cert. denied* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972) ("merger negotiations require a secrecy, flexibility and quickness antithetical to collective bargaining").

**103.** *See* pages 726–727 *supra.*

**104.** *See Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 211, 85 S.Ct. 398, 403, 13 L.Ed.2d 233 (1964) ("The Act was framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife . . . To hold, as the Board has done, that contracting out is a mandatory subject of collective bargaining would promote the fundamental purpose of the Act by bringing a problem of vital concern to labor

and management within the framework established by Congress as most conductive to industrial peace."); *NLRB v. American National Insurance Co.,* 343 U.S. 395, 401–02, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952) ("The National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employees. The Act does not compel any agreement whatsoever between employees and employers. Nor does the Act regulate the substantive terms governing wages, hours and working conditions which are incorporated into an agreement. The theory of the Act is that the making of voluntary labor agreements is encouraged by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively." [footnotes cmitted]).

known, we do not have the desirable, firm factual underpinning necessary to utilize the balancing approach enunciated in this opinion. For that reason, we shall not at this time enforce the Board's order relating to an unfair labor practice by Brockway.[105]

### III.

There remains the issue whether, even if the facts ultimately were to provide a basis for concluding that Brockway committed an unfair labor practice, it would be appropriate in such event to require that Brockway enter negotiations upon request with the union. It is true that the NLRB "has broad discretion to adapt its remedies to the needs of particular situations" in order to effectuate the policies of the Act.[106] It is still necessary, however, that the order be fitting in view of the factual configuration in a given case. Indeed, the Supreme Court has specified that the NLRB should not be foreclosed from issuing rather sweeping orders to remedy an unfair labor practice so long as "the circumstances of the particular case" justify the action.[107]

A difficulty with ordering bargaining in this case has become evident from an uncontradicted statement at oral argument that, in the interval since the NLRB issued its direction in this matter, Brockway has ceased all of its truck-related business operations. If that is correct, and we are unable to determine with exactitude whether it is or not, then it would appear that to require bargaining with the union at this time regarding the decision to close the Philadelphia plant would constitute a futile act. For if Brockway is entirely out of business, it would be most unlikely to undertake to reconsider its earlier determination to close the Philadelphia facility. There is no apparent purpose in directing a meaningless activity and, indeed, there is a strong policy in favor of limiting enforcement of the Board's orders to situations where it would not be fruitless.[108]

**105.** The dissent apparently rests on a fundamental misconception of the analysis in the majority opinion. The dissent claims, at p. 742 that we have adopted a *per se* rule relating to the duty to bargain about partial closings. However, that is exactly what this opinion rejects. Moreover, the dissent states, at p. 744, that the majority has created a bright line between closings for economic reasons and closings for severe economic considerations. We think otherwise, for indeed there is no bright line to be found in an appropriate analysis of the duty to bargain about partial closings. Rather, the majority's position is that it is incumbent upon a court, following the mandate of the statute and of *Fibreboard,* to be sensitive to the guiding public law principles as well as the private interests of labor and management relating to the decision to close the plant, and in so doing to avoid reliance on any supposed "bright lines" or magic words. Further, the dissent incorrectly states that the majority "create an untenable rule based on the degree of economic harm," at p. 742. We do not establish any set or fixed rule in this area, but rather espouse the view that all of the circumstances of a case must be weighed.

The curious fact is that while the dissent seems to criticize the majority for adopting a *per se* rule, the dissent itself rushes to a conclusion that is itself predicated on a *per se* rule, namely, that when "economic considerations" lead to a decision to close a plant, whatever they may be, the employer *ipso facto* has no duty to bargain about that determination.

Such an approach loses sight of the statutory mandate to balance competing interests in each situation.

Ultimately the dissent's analysis falls back on the notion that the free enterprise system demands the result it desires, *see* p. 748, without sufficiently explaining why and without adequately noticing that the free enterprise system is regulated by federal labor law and policy, and is thus not properly viewed basically *in vacuo* and in terms of the private interests of only one party to a labor-management dispute.

**106.** *Local 60, United Brotherhood of Carpenters v. NLRB,* 365 U.S. 651, 655, 81 S.Ct. 875, 877, 16 L.Ed.2d 1 (1961).

**107.** *See May Department Stores Co. v. NLRB,* 326 U.S. 376, 392, 66 S.Ct. 203, 213, 90 L.Ed. 145 (1945) ("While the Board has been delegated initially the exclusive authority to prevent unfair labor practices, courts, which are called upon to enforce such orders, by their own decrees, may examine its (sic) scope to see whether, on the evidence, they go beyond the authority of the Board as to require modification as a matter of law before enforcement." (footnote omitted))

**108.** *Cf. NLRB v. Winn-Dixie Stores, Inc.,* 361 F.2d 512, 517 (5th Cir. 1966) ("While there was a duty on the part of Winn-Dixie to consult and bargain with the Union as the employees' representative before discontinuing its cheese cut-

This is not to say, however, that the NLRB could not properly direct such a remedy if, after further factual development in proceedings before the Board, it appears that there is a basis for concluding that, first, there was a violation of the duty to bargain and, second, to command bargaining with the union would not be pointless.[109]

## IV.

In sum, we will not at this time enforce the Board's order that Brockway "cease and desist" from refusing to bargain with the union about the decision to shut down the plant in question and that, upon request, the employer commence bargaining on that subject.[110] That conclusion is, of course, without prejudice to the NLRB to commence additional proceedings should it seek to do so.

ROSENN, Circuit Judge, dissenting.

There is but a single narrow issue before us in this appeal. Is an employer's decision to close one of its plants, without prior consultation with its union representatives, an unfair labor practice under the National Labor Relations Act ("NLRA"),[1] if that decision is motivated *solely* by economic considerations? Because of its failure to confine itself to this limited question, the majority opinion departs from the principles of this court's landmark decision in *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191 (3d Cir. 1965), and the views prevailing in a majority of federal appellate courts. Therefore, I must respectfully dissent.

## I.

The facts of this case are brief and straightforward. Brockway Motor Trucks, Division of Mack Trucks, Inc., ("Brockway") and Local 427 of the International Association of Machinists and Aerospace Workers ("the Union") had been parties to collective bargaining agreements covering employees at the company's Philadelphia facility[2] —identified by the National Labor Relations Board ("the Board") as "Garage, Factory Branch" engaged in "Sales and Services, New and Used Trucks." On September 14, 1975, the last collective bargaining agreement between the company and the Union expired. The parties engaged in fruitless negotiations over a new contract for a period of about ten months, when the company unilaterally decided to discontinue operation of the Philadelphia facility. One day later, in writing, Brockway informed the Union of that decision.

On August 16, 1976, the Union filed a charge with the Board that Brockway had committed unfair labor practices under sections 8(a)(1) and 8(a)(5) of the NLRA[3] by failure to negotiate over the closing of the plant. The Union asserted that the closing of the Philadelphia facility was a mandatory subject of bargaining and that therefore the company's unilateral decision was an

---

ting and prepackaging operation at its Jacksonville warehouse, we do not think at this late date it should be required to bargain with the Union as to its reestablishment. That, because under the facts proven by uncontradicted evidence, we think Winn-Dixie, for good and sufficient reasons, would undoubtedly refuse to reestablish such operation and that to bargain with respect to such reestablishment would be a mere 'exercise in futility.'"

**109.** *Cf. NLRB v. American Manufacturing Co. of Texas*, 351 F.2d 74, 81 (5th Cir. 1965) ("[W]e do not hold that the Board could not properly impose such a remedy. We hold merely that it lacks necessary support in this record.").

**110.** Since the portions of the Board's order that deal with reinstatement and backpay are closely linked with the direction that the employer commence bargaining with the union about the closing of the Philadelphia facility, they, too, will not be enforced at this time.

**1.** 29 U.S.C. §§ 151–68 (1970).

**2.** The Philadelphia facility was only one part of Brockway's entire operation.

**3.** Section 8(a) of the Act provides in pertinent part:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of [their rights];

\* \* \* \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees . . . .

29 U.S.C. § 158(a)(1) & (5) (1970).

unfair labor practice under section 8(a)(5).[4] On September 23, 1976, the Board filed a complaint against Brockway for its action in the closing of the Philadelphia facility.

Before rendering a decision on that complaint, the Board entered into an agreement with Brockway that the case would be decided on the basis of a stipulated record. The parties then agreed that Brockway had discontinued operations at the Philadelphia facility *solely* because of "economic considerations." Brockway, in answer to the Board's complaint, asserted that because of that stipulation, the case was governed by *Royal Plating & Polishing Co., supra*, and that even absent the stipulation, an employer's decision to close a facility is never a mandatory subject of bargaining unless motivated by anti-union animus.

The Board rejected Brockway's arguments. Instead, it decided that the company had committed an unfair labor practice by failing to bargain with the Union prior to deciding to close the Philadelphia facility. It took the position that an employer is generally obligated to bargain with its employees over a partial closing of the employer's business,[5] even if the decision to close is motivated solely by "economic considerations."

Therefore, in the posture of this appeal, both Brockway and the Board assert broad positions calling for *per se* rules to deal with any decision of an employer to partially close his business. The majority take the position that neither the Board nor Brockway is correct, and reject any *per se* rule. Maj. Op. at 734. Paradoxically, the majority adopt a *per se* rule of their own: that the decision to partially close a business is *presumptively* a mandatory subject of bargaining except in the very limited situation when that decision is the result of severe economic conditions. In reaching this unprecedented and unnecessary conclusion, the majority brush aside the teaching of *Royal Plating*, give inadequate consideration to the important interests of the employer partially to close its business, and create an untenable rule based on the degree of economic harm. Such a shaky foundation for so broad a construction of the duty to bargain compels me to dissent.

## II.

*Royal Plating & Polishing Co., supra*, is the cornerstone of this court's decisional law dealing with an employer's duty to bargain over the partial closing of its business. In that case, the Board had found the company guilty of an unfair labor practice because it had closed one of its two plants, located within two blocks of the other, without undertaking negotiations with the union. On appeal, this court narrowly tapered the issue before it, "whether an employer's unilateral decision to close part of his business *solely for economic reasons*" constitutes an unfair labor practice. 350 F.2d at 193 (emphasis supplied). We reasoned that under the facts of the case—the company had suffered severe losses and was facing a possible condemnation—the failure of the employer to bargain was not an unfair labor practice. Chief Judge Biggs concluded that "an employer faced with the economic necessity of either moving or consolidating the operations of a failing business has no duty to bargain with the union respecting its decision to shut down." *Id.* at 196.[6]

---

**4.** Section 8(a)(5) requires only that an employer bargain over mandatory subjects of bargaining as defined in section 8(d) of the Act, which provides in pertinent part, that collective bargaining is a joint responsibility of the employer and the union "with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d) (1970).

**5.** The Board treats a closing by a company of one of its several plants as a partial closing even if the company's plants are in distinct communities and are not part of the same bargaining unit. In the instant case, Brockway's Philadelphia bargaining unit apparently was separate from those at its other plants.

**6.** The court, however, specifically noted that even under such circumstances, if there is a discriminatory motive for such a closing, bargaining would be required. *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191, 196 n. 4 (3d Cir. 1965). The court also noted that an employer must notify the union of its intention to close in order to permit the affected employees to bargain over the effects of the closing.

Although the facts in *Royal Plating* revealed severe economic problems with the company, nothing in Judge Biggs' reasoning limited the rule enunciated to such a narrow case. Rather, the opinion dealt with the somewhat broader problem of the employer's duty to bargain over changes in the economic direction of the company. Judge Biggs' opinion, decided only one year after the Supreme Court's seminal decision of the duty to bargain in *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), (involving the somewhat analogous question of duty to bargain over contracting out), took great pains to distinguish the reasoning of the Supreme Court. He noted that in *Fibreboard* "there was no change in the economic direction of the company" and that the decision to contract out "involved no decision respecting commitment of [investment] capital." 350 F.2d at 195. Moreover, Chief Judge Biggs did not stop with this basic distinction. He went on to discuss its meaning, noting that partial plant closings essentially involve major changes in the economic direction of a company, and hence lie at the center of management's ability to manage, outside the scope of mandatory bargaining.

"Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepren[e]urial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment.

*Id.* at 196–97. In the instant case, we are concerned neither with discriminatory motive nor failure to bargain over effects.

7. The majority stress that the record on appeal contains no specific catalogue of the economic harm suffered by Brockway. *See* Maj. Op. at pp. 723–724, 738–739. They therefore would require the Board to undertake further factual findings to determine the precise cause of the closing. The record, however, does include a stipulation by the parties that "economic considerations" led to the closing of

* * * [T]hose management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area [Section 8(d)]."

*Royal Plating & Polishing Co., supra*, 350 F.2d at 196, *quoting with approval, Fibreboard Paper Products Corp. v. NLRB, supra*, 379 U.S. at 223, 85 S.Ct. 398 (Stewart, J., concurring).

I believe that the stipulation in this case, that the closing of the Philadelphia facility was solely for economic reasons, puts this case within the four corners of *Royal Plating*. The majority, however, endeavor to distinguish the instant case from *Royal Plating* on the ground that the decision to close in the latter case came only after prolonged severe economic loss and a threatened condemnation of the land on which the plant was located. Maj. Op. at 727–728. In my view, this distinction cannot be drawn validly from the reasoning of *Royal Plating*.[7]

The majority indicate that the case stands for the extremely narrow proposition that bargaining is mandatory except when economic conditions are so severe that a move is a financial necessity and negotiation would serve no rational purpose. Maj. Op. at pp. 728, 732. While it is true that the company in *Royal Plating* was in such a condition, the opinion did not address the general question of severity of distress posed by the majority. Rather, the opinion's reasoning indicates that the severe circumstances faced by the company, added up to no more than that the closing rested on bona-fide economic reasons[8] and was not

the Philadelphia facility. This term obviously had meaning to them and it seems to me that it provides sufficient substance for us to determine the narrow question presented here.

8. The term "economic" in this context has been considered synonymous with "maximization of profits." Comment, *"Partial Terminations"—A Choice Between Bargaining Equality and Economic Efficiency*, 14 U.C.L.A.L.Rev. 1089, 1090 (1967) ("Comment, *'Partial Terminations'"*). No doubt, the term also may be used to refer to a decision to minimize

motivated by any anti-union animus. I fail to see any sound distinction between a closing for economic necessity and one for economic considerations; both are grounded on the principle that the closing is the consequence of compelling business considerations, not anti-union motivation.

The majority's tenuous distinction which creates a bright line between closings for economic reasons and closings for *severe* economic reasons finds no support among other courts. In fact, the view prevailing across the federal judiciary is that bona-fide economic considerations for a partial closing remove a case from mandatory bargaining.[9] Moreover, the majority distinction appears to be no than a *post facto* rationalization from the facts of certain cases to support a

novel principle. The clear standard enunciated by the courts that have spoken on this issue is that "absent union animus, a company has no legal duty to bargain with a union over the decision to partially shut down its operation because of *economic reasons*." *Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1039 (8th Cir. 1976), (emphasis supplied). Although in some cases these "economic reasons" have been severe, *see, e. g., NLRB v. Transmarine Navigation Corp.*, 380 F.2d 933 (9th Cir. 1967); *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170 (2d Cir. 1961), no court has stated the rule as narrowly as advocated by the majority and the majority can cite no case in which an employer was found to have bona fide economic reasons for a partial closing and yet was required to bargain mandatorily.[10] Therefore, the gen-

losses. At any rate, an economic decision is rationally based on an attempt to seek the highest return on investment capital.

**9.** *See Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1039 (8th Cir. 1976) (dicta) (no duty to bargain over partial closing for "economic reasons" absent union discrimination), *citing with approval, Morrison Cafeterias Consolidated, Inc. v. NLRB*, 431 F.2d 254, 257 (8th Cir. 1970), *NLRB v. Drapery Manuf. Co.*, 425 F.2d 1026 1027–28 (8th Cir. 1970), and *NLRB v. Adams Dairy, Inc.*, 350 F.2d 108, 110–13 (8th Cir. 1965), *cert. denied*, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966); *International Union, United Automobile Aerospace & Agricultural Workers v. NLRB*, 152 U.S.App.D.C. 274, 470 F.2d 422 (1972) (Justice Clark, sitting by designation) (change from manufacturer owned to independent franchise, at the core of entrepreneurial control, no duty to bargain in absence of anti-union animus); *NLRB v. Thompson Transport Co.*, 406 F.2d 698, 703 (10th Cir. 1969) (company "solely motivated by a sound economic" reason had no duty to bargain over decision to partially close in the absence of anti-union animus); *NLRB v. Transmarine Navigation Corp..* 380 F.2d 933, 939 (9th Cir. 1967) (company decision based solely on greatly changed economic conditions not mandatory). *See also NLRB v. North Carolina Coastal Motor Lines, Inc.*, 542 F.2d 637, 638 (4th Cir. 1976) (per curiam) (dicta); *International Ass'n of Machinists v. Northeast Airlines, Inc.*, 473 F.2d 549, 556–57 (1st Cir. 1972) (no mandatory bargaining over a merger which is at the core of "entrepreneurial control"); *NLRB v. Dixie Ohio Express Co.*, 409 F.2d 10, 11 (6th Cir. 1969) (per curiam) (streamlining of operation entailing partial termination of plant operations, held non-mandatory); *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170, 175 (2d Cir. 1961)

(movement of plant for "business necessity" and "valid economic reasons" not mandatory bargaining subject).

**10.** The majority outline a "range of subjects that *courts* have held to be mandatory subjects of bargaining," including partial closings of one plant of an employer's business. Maj. Op. at pp. 726–727. Yet, no case is cited in which a partial closing was held to be a subject of bargaining; no case is cited in which a closing for economic considerations was held to be a subject of bargaining; and no case is cited making any distinction between closings for economic reasons and closings for severe economic reasons. In fact, the majority's main support is that of tenuous decisions of the · Board, *e. g., Ozark Trailers, Inc.*, 161 NLRB 561 (1966), *disapproved by, Royal Typewriter Co. v. NLRB, supra*, 533 F.2d at 1039, and that of inapposite cases decided by other courts, *e. g., NLRB v. Amoco Chemicals Corp.*, 529 F.2d 427 (5th Cir. 1976) (case involves failure to negotiate over reduction in hours); *Weltronic Co. v. NLRB*, 419 F.2d 1120 (6th Cir. 1969), *cert. denied*, 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1970) (case involves a plant relocation); *NLRB v. Winn-Dixie Stores, Inc.*, 361 F.2d 512 (5th Cir.), *cert. denied*, 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966) (case involves closing only a part of the operations at one of the employer's warehouses); *NLRB v. American Manuf. Co. of Texas*, 351 F.2d 74 (5th Cir. 1965) (case involves contracting out).

Citation to these cases demonstrates an inherent failing in the majority opinion—economic partial closings are closely analogized to contracting out and plant relocation. See Maj. Op. at p. 724, n. 10; p. 730; pp. 735–736. In my view, such cases are entirely different than cases involving a decision to close one's business.

erally accepted rule appears to be that any partial closing for bona fide economic reasons, not motivated by anti-union animus, is not a mandatory subject of bargaining.

## III.

In determining the scope of the employer's duty to bargain, the majority assert that "the act of closing a plant appears to come within the literal language" of the NLRA because it concerns "terms and conditions of employment." Maj. Op. at 735. From this assertion they conclude that "there is an initial presumption . . . that a partial closing is a mandatory subject of bargaining." *Id.* They then would focus on the facts of each case to determine the "applicability" of the duty to bargain and balance the interests of the employer and his employees to ascertain whether bargaining should be ordered. *Id.* at 737. This procedure, in my view, confuses the question of what is a mandatory subject of bargaining with the question of the proper remedy to order once it has been determined that an employer should have bargained. The focus should not be on the "applicability" of the duty to bargain, but should be on whether the duty exists at all. The question is one of line-drawing—does the employer's action fall on the side of the line requiring bargaining or does it fall on the side of the line not requiring bargaining? Balancing is used in assessing the propriety of the employer's action, not in determining if the employer is to be excused because of equitable considerations from bargaining.

Plant relocations, contracting out, and the closing of an operation within a plant, involve decisions by management which of necessity call for the replacement of existing employees with others. This feature is what mandates discussion by the employer with the employees and it is this feature which is conspicuously lacking in the instant case.

11. Judge Biggs, in distinguishing *Fibreboard* in *Royal Plating,* found that the critical difference between contracting out and an economic partial closing is that in the latter case the decision is one which involves a major change in the economic direction of a company. *Royal Plating & Polish Co., supra,* 350 F.2d at 196. His apparent belief was that to require bargaining over such a decision would significantly abridge the employer's freedom to manage his

Like the majority, I too begin with an analysis of the *Fibreboard* decision, for within that opinion is the philosophical guidepost that has led most courts to the conclusion that certain decisions in the running of a business may be made by the employer alone without prior consultation with its union representatives. In *Fibreboard,* the Court held that the contracting out of work "previously performed by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representatives of their employees to bargain collectively." 379 U.S. at 209, 85 S.Ct. at 402. In reaching this conclusion, the court pointed out that the employer's decision to subcontract the maintenance work did not alter the company's basic operation, that the maintenance work still had to be performed at the plant, and that the company was merely replacing its employees with those of a contractor who would do the same work at the same plant under similar circumstances. From these facts, the Court concluded that contracting out was not so central to the management of a business that requiring "the employer to bargain about the matter would . . . significantly abridge his freedom to manage the business." *Id.* at 213, 85 S.Ct. at 404, *see id.* at 223, 85 S.Ct. at 409 (Stewart, J., concurring) ("Decisions concerning the commitment of investment capital" are for the employer).[11] Implicit in *Fibreboard* is that the NLRA does not require mandatory bar-

business. Of like effect are the decisions of the Eighth Circuit.

In *NLRB v. Adams Dairy, Inc., supra* the Eighth Circuit almost simultaneously with the decision in *Royal Plating* came to the conclusion that the dairy's decision to liquidate the part of its business handling distribution of milk products, without consultation with the union, was not a subject of mandatory bargaining because it was outside of the limited scope of *Fibreboard,* 350 F.2d at 110–13. *See Royal Typewriter Co. v. NLRB, supra,* 533 F.2d at 1039 (rejecting the Board's narrow reading of *Fibreboard* in *Ozark Trailers, Inc.,* 161 NLRB 561, 564–70 (1966) that an employer operating two or more plants is obligated to bargain with respect to the closing of one of them); *NLRB v. Drapery Manuf. Co., supra,* 425 F.2d at 1027–

gaining on all subjects which might be of interest, and that it excepts those areas "at the core of entrepreneurial control" from such a constraint. *Id.* at 223, 85 S.Ct. at 409 (Stewart, J., concurring).

The majority read *Fibreboard* to stand for the proposition that employer actions that lead "to the termination of at least some employees" are subjects for bargaining. Maj. Op. at 735. However broad the language in *Fibreboard* quoted by the majority may be, the case does not support the expansive proposition for which it is cited. The Court did not hold that all actions of an employer leading to terminations are mandatory subjects of bargaining; it specifically held that not even all subcontracting actions are such subjects.

> We are thus *not expanding the scope of mandatory bargaining* to hold, as we do now, that the type of "contracting out" involved in this case—the *replacement of employees* in the existing unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8(d). *Our decision* need not and *does not encompass* other forms of "contracting out" or "subcontracting" which arise daily in our complex economy.

*Fibreboard Paper Products Corp. v. NLRB, supra,* 379 U.S. at 215, 85 S.Ct. at 405 (emphasis supplied).

Justice Stewart's concurring opinion makes it clear beyond doubt that *Fibreboard* does not hold "termination" actions *per se* to be mandatory subjects of bargaining. "The Court most assuredly does not

decide that every management decision which necessarily terminates an individual's employment is subject to the duty to bargain." 379 U.S. at 218, 85 S.Ct. at 407. Justice Stewart emphasized that entrepreneurial decisions as to "what shall be produced, how capital shall be invested in fixed assets, or what the basic scope of the enterprise" should be, even if they result in termination of employees, are not subjects of bargaining. *Id.* at 225,[12] 85 S.Ct. at 410. Rather, he joined the majority opinion because the case involved

> the substitution of one group of workers for another to perform the same task at the same plant under the ultimate control of the same employer. The question whether the employer may discharge one group of workers and substitute another for them is closely analogous to many other decisions within the traditional framework of collective bargaining.

*Fibreboard Paper Products Corp. v. NLRB, supra,* 379 U.S. at 225, 85 S.Ct. at 410 (Stewart, J. concurring).

This limited holding, balancing the right of an employer to substitute new and cheaper labor for his present employees against their rights, is of little relevance to a case such as this, where the employer is severing his relationship with all employees at a plant and not seeking any replacements.

*Textile Workers Union v. Darlington Manuf. Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), reinforces this conclusion. Darlington, after unsuccessfully resisting a union organizing campaign, promptly liquidated and sold its plant and

28 (Blackmun, J., now Associate Justice, sitting on panel) (distinguishing *Fibreboard* and *Ozark Trailers,* the court holds that the decision of a parent company to close its subsidiary involved a major shift in investment capital, hence the decision to close not a mandatory bargaining subject under *Fibreboard*).

12. Because the majority require mandatory bargaining, they endeavor to take this case out of the type outlined by Justice Stewart as non-mandatory bargaining subjects. Maj. Op. at 733, n. 79. The attempted distinction does not succeed, for although it is true that the decision to close partially is not a decision to allocate

finances for advertising, to utilize labor-saving machinery, or to go out of business entirely, Justice Stewart did not limit his remarks to such specific events. Rather, he spoke generally of decisions like those above, which involve "commitment of investment capital and the basic scope of the enterprise" which are "not in themselves primarily about conditions of employment." *Fibreboard Paper Products Corp. v. NLRB, supra,* 379 U.S. at 223, 85 S.Ct. at 409 (Stewart, J., concurring). The decision partially to close a business is primarily a decision of how to commit capital and involves the basic scope of the enterprise.

equipment without prior consultation with the union. The Board found that the closing was due to the company president's anti-union animus, and concluded that the company had violated section 8(a)(3) of the NLRA.[13] Even in face of this acknowledged anti-union basis for the plant closing, the Supreme Court held that liquidation of an entire business, whether "motivated by vindictiveness toward the union," or not is not an unfair labor practice. 380 U.S. at 274, 85 S.Ct. at 1001. The predicate for the Court's decision was that the force of a closing is completely spent as to that business when it terminates the enterprise. Id.[14]

The majority recognize that a decision to close an entire business is not a mandatory subject of bargaining, but nonetheless attempt to place this case, involving a partial closing, into a separate analytic category. They equate this case with a plant relocation and see "no justification for drawing any bright line between a partial closing situation . . . and the subcontracting issue of Fibreboard." Maj. Op. at 724, n. 10; 735. I believe that by placing the

closing of an entire business on one side of the bargaining line and partial closings, plant relocations, and subcontracting on the other side, the majority fail to recognize a crucial distinction—relocation and subcontracting generally result in replacement of employees, closings do not.

As much as a partial closing results in termination of employment, so does a closing of an entire business. There is no logical way, in terms of the presumption established by the majority, to create a bright line between the closing of an entire business and any of the situations listed above. The only consistent factor I can discern is that both plant relocations and contracting out usually result in the replacement of present employees with others, and partial and entire closings do not. In my view, the line for mandatory bargaining purposes falls between subcontracting and relocation on the one hand and plant closings on the other, except when anti-union animus is present.[15]

Taking our decision in Royal Plating and those of the Eight Circuit, see n. 9 & 11, supra, in light of Fibreboard and Darling-

---

**13.** Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hiring or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3) (1970).

**14.** The Court did note, however, that "a discriminatory partial closing may have repercussions on what remains of the business, affording employer leverage for discouraging the free exercise of [employee] rights . . . ." Textile Workers Union v. Darlington Manuf. Co., 380 U.S. 263, 274–75, 85 S.Ct. 994, 1002, 13 L.Ed.2d 827 (1965) (emphasis supplied). See Royal Plating & Polishing Co., supra, 350 F.2d at 196 n. 4; Rabin, Fibreboard and the Termination of Bargaining Unit Work: The Search for Standards in Defining the Scope of the Duty to Bargain, 71 Colum.L.Rev. 803, 816–21 (1971).

The Board has interpreted Darlington's holding that a partial closing for discriminatory reasons violates section 8(a)(3) as support for finding a section 8(a)(5) violation in an economic closing. See Comment, "Partial Terminations," supra, 14 U.C.L.A.L.Rev. 1098–99. Darlington, however, cannot be read so broadly:

Section 8(a)(3) is intended to prevent the employer from using discrimination to destroy the bargaining strength of the union. . . . Different considerations are involved when scrutinizing an act allegedly violating section 8(a)(5). Under section 8(a)(5), the effect on labor's bargaining position of insulating "partial termination" decisions must be considered, but also to be considered are the consequences of allowing labor to participate in capital reallocation decisions. . . . Since the question of whether the employer must bargain was not an issue in Darlington, the Court did not have to consider the effect of its ruling on the free allocation of capital. Hence, the NLRB's reliance on Darlington is misplaced when analyzing section 8(a)(5) cases involving free allocation of capital.

Comment, "Partial Terminations," supra, 14 U.C.L.A.L.Rev. 1099 (footnotes omitted).

**15.** See Schwarz, Plant Relocation or Partial Termination—The Duty to Decision-Bargain, 39 Fordham L.Rev. 81, 100 (1970) ("Decision-bargaining should be required in all cases where the employer plans to substitute non-unit workers for unit workers.").

*ton* one is led to the inescapable conclusion that when an employer's partial closing involves a reallocation of fixed investment capital, causes a basic change in the direction of the business, does not involve replacement of present employees with others, and does not carry an anti-union animus, the employer is under no duty to bargain. This conclusion is soundly based, not only in law, but in the realities of economics and industrial relations.

## IV.

I respect the majority's solicitude for those who may suffer from the closing of plant operations. I too am concerned with the potentially harsh and demoralizing impact upon the lives and fortunes of employees and their families dislocated by the permanent closing of a plant, a problem which has engaged the constructive concern of the Congress, state legislatures, employers, and organized labor and which has led to the enactment of unemployment compensation laws, supplemental unemployment compensation plans, severance pay, and other forms of remedial relief. That concern, however, does not blind me to the countervailing interests of a freely operating economic system. I believe that, at least as to a plant closing for economic reasons, an employer has the right to unilaterally close his operations.

There are valid reasons why a requirement that an employer bargain over a decision partially to close its business could be harmful to the employer, to the economy, and to the prospects for further jobs. If an employer must bargain before he can reach a decision to close a plant, how long must he continue to operate under possibly adverse, costly, and unprofitable conditions while the bargaining process goes on? How long must bargaining continue and who shall decide and by what criteria shall it be determined whether the bargaining has been sufficient? When the employer ceases

bargaining, is he susceptible to a charge of bad faith or coercion? Must he engage in protracted litigation over a significant business judgment which may have to be implemented promptly, if it is to be made at all? These questions are unanswered by the majority and are treated as subsidiary to the ultimate question of whether there is a duty to bargain.[16]

That ultimate question—the duty to bargain—is, in my view, inextricably bound in considerations such as those raised above. As we stated in *Royal Plating & Polishing Co., supra,* in each case, the interests of the employees and the purpose of the NLRA in securing industrial tranquillity "must be carefully balanced against the right of the employer to run his business." 350 F.2d at 196. The majority have barely explored that right.

The balance to me in the case of a partial closing for economic reasons seems to rest with the employer. On the one hand, when the employer in the exercise of his knowledge, experience, and judgment concludes that it is no longer economically feasible to continue operation of one of its several plants, a timely termination of the investment in that plant and a reinvestment elsewhere makes a genuine contribution to the economy—possibly preserving the jobs of the employees at the employer's other plants or creating new jobs with the reinvested funds. On the other hand, notice in advance to the union of an expected decision to close and forced bargaining of the issue will allow the union to discuss the question and make suggestions for preservation of the business. However, that interest must be balanced against the effects of the bargaining decision which not only could place the company at a disadvantage in dealing with its suppliers and customers, but could also cause the loss of the business of those seeking new supply sources in the face of the impending closing. Moreover,

---

**16.** The majority do suggest that nothing compels agreement by the employer with the union's request to stay in business. Although it is true that collective bargaining under section 8(d) "does not compel either party to agree to a proposal or require the making of a concession," 29 U.S.C. § 158(d) (1970), this alone is not enough to outweigh the many problems which may arise during the pendency of the negotiations. *See infra.*

news of the closing, once publicly revealed in the bargaining context, may generate additional losses, adversely affect plant morale, and impair productivity. Opportunities to liquidate assets, sell or lease property, or disengage from burdensome contracts may be lost, especially if the Board were to exercise its injunctive powers to maintain the status quo pending resolution of the bargaining dispute. Overall, the balance must favor the employer in this admittedly non-discriminatory context.

A private free enterprise system requires and our national labor policy is flexible enough to reflect, that private ownership must have necessary prerogatives to independently decide whether it can remain in business, whether it must close one of its several plants, or whether it must restructure its business through merger or some other form of association.[17] Such a decision, although it will no doubt have an effect upon the employees [18] is not a mandatory subject of bargaining if it is free from anti-union overtones and is based on bona fide economic considerations.

### V.

The majority recognize the important interest that the employer has in the ability to make an unfettered decision to terminate a business suffering from *severe* economic distress, but do not extend their reasoning

to a case of "economic considerations." Although the degree of economic harm which influenced Brockway's decision to close is not known, certain inferences may be made and certain facts are evident:

(1) No evidence of anti-union animus or vindictiveness was involved in Brockway's decision to close. *See Royal Plating & Polishing Co., supra,* 350 F.2d at 196 n. 4.

(2) No evidence exists that Brockway closed its plant to avoid contractual obligations with the Union. *See International Ladies' Garment Workers Union v. NLRB,* 150 U.S.App.D.C. 71, 463 F.2d 907 (D.C.Cir. 1972) ("runaway plant" situation).

(3) No evidence exists that Brockway closed part of a plant and substituted non-unit workers for those it displaced. *See Fibreboard Paper Products Corp. v. NLRB, supra.*

(4) One can reasonably infer that in the absence of anti-union animus, a profit-maximizing company, stipulated to be acting solely for economic reasons, will not close its facility in a major metropolitan area of the nation unless, in its judgment the economic reasons are so severe as to mandate such action.

Given these considerations, and those raised in parts III and IV, *supra,* there is no justification for ordering bargaining here.[19]

---

17. If the economy is to function effectively, capital must be free to flow from one use to another, from a sterile area of the country to one alive and productive. Such free flow of capital is essential to the efficiency, growth, and well being of a dynamic economy. *See* Comment, *"Partial Terminations," supra,* 14 U.C.L.A.L.Rev. 1091 (the courts have "an obligation to consider the effect on the economy of labor participation in capital reallocation decisions").

18. The free flow of capital is not only essential to a strong and vibrant economy, it is also in the sound interest of labor. "The achievement of labor's goals is also linked to the performance of the economy, and the performance of the economy is linked to the ability of entrepreneurs to make rational economic decisions concerning the manner in which their capital is invested." Comment, *"Partial Terminations," supra,* 14 U.C.L.A.L.Rev., *supra,* 1094–95.

19. The majority suggest that to the extent that Brockway's decision to close is due to the high cost of production, negotiations could be fruitful. The facts of this case, as well as ordinary experience in industrial relations, suggest the contrary. When, as here, a union and employer have unsuccessfully negotiated over terms of a collective bargaining agreement for many months, it is hardly conceivable that the union will consent to a decision which will terminate the employment of its members and possibly the union local itself, or that the employer can be persuaded to operate uneconomically. The duty on the employer to discuss and negotiate the "effects" of the closing, *see Royal Plating & Polishing Co., supra* 350 F.2d at 196–97; n. 6, *supra,* will provide ample opportunity for the employer to reconsider the closing if it has imprudently failed to give proper weight to all considerations prior to its decision. The intrusion into employer prerogatives advocated by the majority may well lead to mischief in the national economy.

A further hearing by the Board would be merely an irrelevant inquiry into the degree and circumstances of the economic considerations which impelled the closing. I therefore cannot join with the majority and would deny herewith enforcement of the Board's order.[20]

---

**20.** It is unclear to me whether the majority have remanded this case to the Board for additional proceedings or whether they have denied enforcement without prejudice. I can agree with neither result, as I believe that no additional action is necessary and that enforcement on the present record must be denied with prejudice.